## No. 12,200.

## WALTON *v.* WALTON.

Decided March 4, 1929.   Rehearing denied June 10, 1929.

1

Mr. HENRY A. LINDSLEY, Mr. HENRY S. LINDSLEY, for plaintiff in error.

Messrs. WRIGHT & IRELAND, for defendant in error.

Mr. HORACE N. HAWKINS, Mr. W. L. BOATRIGHT, Messrs. BARDWELL & BARDWELL, Messrs. ROBINSON & ROBINSON, Messrs. VAN CISE & ROBINSON, Messrs. IRELAND & BLACKMAN, Messrs. PONSFORD, PENDER & LARWILL, Messrs. RHOADS & SEEMAN, Messrs. LEWIS & GRANT, amici curiae.

*En Banc.*

Mr. JUSTICE ALTER delivered the opinion of the court.

THIS is an action for divorce in which the defendant in error, James B. Walton, hereinafter referred to as plaintiff, filed a complaint charging his wife, Lillian M. Walton, the plaintiff in error, hereinafter referred to as defendant, with cruelty and desertion. The defendant filed her answer denying the charges of cruelty and de-

sertion, and also filed a cross-complaint charging the plaintiff with adultery, and prayed a decree of separate maintenance. The plaintiff filed an answer to the cross-complaint denying the allegations thereof.

The case was called for trial, a jury was sworn therein, and upon leave of court so to do, the plaintiff withdrew his complaint. The defendant was permitted to amend her cross-complaint by prayer for divorce. The jury was discharged, with the consent of the parties, and the case proceeded to trial before the court as a non-contested matter.

The defendant was awarded findings of fact and conclusions of law, and certain orders were made, upon stipulation of the parties, with respect to a settlement of their financial affairs, and incorporated in said findings.

The defendant subsequently filed a motion to set aside the findings of fact and conclusions of law, to which the plaintiff filed an answer, in which he joined in a request of the defendant that ''the cause be set down for hearing and trial * * * including the terms of alimony,'' and also prayed that a decree of divorce be granted the defendant, the six months' period subsequent to the signing and filing of the findings of fact and conclusions of law, having fully expired.

The court, upon hearing the defendant's motion and pleadings thereto, made certain modifications with respect to the financial arrangements of the parties, and also granted, upon application of the plaintiff, and over the express objection of the defendant, the decree of divorce.

The defendant was dissatisfied with the trial court's action: (1) In modifying its former orders respecting the payments to be made for the support of herself and the two minor children; and (2) in granting the decree of divorce upon the application of the plaintiff. To review this action, the defendant brings the cause to this court.

1. The trial court, in its findings of fact and conclusions of law, adopted, and incorporated therein, the financial arrangement of the parties to this action. Subsequently, at a hearing, the court found that the plaintiff, by reason of changed conditions, without his fault, was unable to continue the payments required of him by court order, and accordingly reduced the same, as to sums for alimony and support money payable in the future, and in all other respects confirmed the financial arrangements made by the parties themselves.

We held in *Stevens v. Stevens,* 31 Colo. 188, 189, 72 Pac. 1061, that "by virtue of the general equity powers of a court granting a divorce * * * such court has the authority to modify the decree relative to alimony payable in the future."

We also held in *Jewel v. Jewel,* 71 Colo. 470, 472, 207 Pac. 991, that "a court of equity by virtue of its general powers has authority to modify a decree relative to alimony, when changed circumstances make it just and necessary."

And we held in *Diegel v. Diegel,* 73 Colo. 330, 332, 215 Pac. 143, that "the court rendering a decree of divorce retains jurisdiction to modify provisions thereof relating to alimony, division of property or a money judgment. Its jurisdiction is continuous."

The law, as thus announced, has been consistently followed since the Stevens case, supra, and while we are mindful that these cases deal directly with decrees, the reason for making it applicable to findings of fact and conclusions of law impress us with equal, if not greater, force. Therefore, the trial court had jurisdiction to hear and determine the question of future payments, and also to make any modification with respect thereto warranted by the evidence. Its determination thereof is binding upon us, unless a reading of the record discloses that the trial court abused its discretion, and this we do not find.

6

2. The court below, in granting a decree of divorce to the defendant, upon application of the plaintiff, proceeded under the provisions of an amendatory act of the legislature, chapter 90, Session Laws of Colorado, 1925, which reads as follows: "If the findings of fact and conclusions of law have not been set aside within six months from the day on which they were filed, and no motion to set them aside remains unheard and undecided, the court shall grant a divorce to the party entitled thereto upon the application or motion of either party to said suit or action, according to the said findings of fact and conclusions of law."

It will be observed that the amendment is mandatory in its terms, does not permit the court to exercise any discretion whatever, and requires the court, under the conditions mentioned therein, to "grant a divorce to the party entitled thereto upon the application or motion of either party to said suit or action."

It should be remembered, that in the instant case, the husband, who was the plaintiff in the divorce action, had been found guilty of a violation of his marital obligations to such an extent as to justify the court below. in finding that the defendant, upon her cross-complaint, was entitled to be forever relieved from the marriage contract. Before the court could enter its findings in favor of the defendant, it must necessarily have found that the defendant had not been guilty of a violation of the marriage contract. It must also be remembered that the defendant strenuously objected to the court's action in granting the decree.

The question naturally arises; is the innocent party, under such circumstances, compelled to accept a decree of divorce because the guilty party desires that one shall be entered? The answer to this depends upon whether or not: (a) The legislature may require a court of equity to grant and issue its decree upon application of the guilty party; (b) the act mentioned (chapter 90, Session

Laws, 1925) is in violation of article III of the Constitution of the state of Colorado; and (c) the amendatory act is a matter of procedure, and if so, does it fall within the provisions of section 444, Code of Civil Procedure, and section 5630, C. L. of Colorado, 1921.

(a) Section 5547, Compiled Laws of Colorado, 1921, provides: "Marriage is considered in law a civil contract, to which the consent of the parties is essential."

In the case of *Stebbins v. Anthony*, 5 Colo. 348, 349, we find the doctrine announced that: "While there are some adjudications to the effect that an action of divorce is a purely statutory proceeding, we think the weight of authority opposed to this view; and that the jurisdiction of the equity tribunals has generally been asserted and maintained in this country in the absence of statutes as well as under them."

An examination of the authorities in this jurisdiction discloses the fact that the doctrine laid down in the Stebbins case, supra, has since been consistently maintained, and therefore, all courts, in entertaining jurisdiction of divorce matters, do so while under their equity powers.

In the case of *Gilpin v. Gilpin*, 12 Colo. 504, 519, 21 Pac. 612, we find the following language: "Society, the public, the commonwealth, have an interest in the preservation of the marriage relation. In an important sense it may well be said there are three parties to every divorce proceeding—the husband, the wife, and the state; and in some instances a fourth—the children."

Also at page 511, we find: "The laws of the state specify many causes for which divorces are allowed. In the opinion of many good people the family household may be thereby too easily broken up and destroyed. The institution of marriage lies at the foundation of our civilization. It is the safeguard of education and true religion, the promoter of public and private morals, and the conservator of social order. Public policy favors the con-

tinuance of the marriage relation, and the courts should not lend their influence to dissolve the same except in obedience to strict law. It does not follow because a married person has a legal ground of divorce that he or she is bound to assert the same in the courts, either as plaintiff, or as defendant by way of cross-complaint.''

The courts in our jurisdiction have always zealously guarded the rights of the innocent spouse, and have refused, in a number of cases, to countenance any attempt to compel the innocent spouse to accept a decree.

In *Milliman v. Milliman,* 45 Colo. 291, 101 Pac. 58, the plaintiff husband filed his complaint charging the defend-' ant wife with cruelty. The wife filed her answer denying cruelty, and also her cross-complaint alleging that the plaintiff had been guilty of cruelty. She did not ask for a divorce. The case was tried to a jury, which returned into court with a verdict in which both parties were found guilty of cruelty, as charged in the respective pleadings of the parties. In a colloquy between counsel, it became evident to the members of the jury, that under their verdict, neither party to said action could obtain a divorce, and thereupon, one of the jurors announced that the verdict was not his verdict. Whereupon, the jury was polled and each juror answered that the verdict was not his verdict. Counsel for the defendant thereupon asked leave to amend her cross-complaint so as to ask for a divorce; which leave was granted, but, in fact, no amendment was ever made. The jury returned with its verdict, finding the defendant not guilty of cruelty, and finding the plaintiff guilty of cruelty. The defendant objected to the reception of the verdict and filed her written motion, in which she moved, ''That no decree of divorce be granted herein.'' She also announced, in her motion, her refusal to amend her cross-complaint praying for a divorce. The court, upon consideration, denied the defendant's motion, and entered a decree of divorce in favor of the defendant upon her cross-complaint. This

court, speaking through Chief Justice Steele, said (page 294):

"The judgment of the court, in refusing the defendant permission to withdraw her request for amendment, is the equivalent of requiring her to procure a divorce over her objection, and is the equivalent of granting to the plaintiff a divorce to which he was not entitled.

"We shall ignore a discussion of the assignments of error which relate to the irregularity of the proceedings by the jury, and shall decide the case wholly upon the proposition that either party in a divorce proceeding, at any time prior to the entering of the decree, has the right to withdraw a demand for a divorce; and that the court cannot compel one to take a divorce when he does not desire to have one. It would be contrary to public policy in a case such as this, to permit the decree for divorce to stand. If the defendant did not desire a divorce, we know of no power or authority of a court to grant her one over her protest."

It is a familiar rule of equity that: "He who comes into a court of equity, must come with clean hands." In the instant case, it is the guilty party who asks a court of equity to enter a decree, nominally in favor of his wife, but in reality in favor of himself, for it was he who sought the divorce in the first instance. He was, by solemn findings of the court, held so derelict in keeping his marital promises as to entitle the defendant to release. It was the husband who was found guilty, and therefore, the court could not, under any circumstances, grant him relief, so that resort had to be had to subterfuge. By forcing a decree upon the one entitled thereto, the guilty party in reality prevailed.

It has been said that the policy of the court should be to discourage, rather than encourage, divorces. The wife may well be entitled to a divorce, but whether or not she will exercise that right is optional with her, and in the instant case, she does not see fit to exercise it.

It may be said that her reasons for refusing are entirely mercenary, but this is unimportant. As was well said in the case of *Gilpin v. Gilpin, supra:* "We are aware that the ready question of modern public sentiment will be: 'Why does not defendant allow plaintiff a divorce if his conduct has been as cruel and distasteful to her and her family as she herself alleges?' It is not necessary for us to answer this question. Still, it is not difficult to surmise reasons satisfactory to her, and perhaps to others. It is no concern of ours whether such reasons please the multitude or not; it is sufficient for the ear of justice that she is entitled to the enforcement of the law for the protection of herself and children in this regard. The fact that so many parties in divorce proceedings contend for nothing except money is no reason why the law should not be administered impartially * * *."

In *Willoughby v. Willoughby,* 71 Colo. 356, 206 Pac. 792, we have a situation somewhat similar to the one in the instant case. The plaintiff husband brought suit in the district court, in which he prayed for a divorce from the defendant wife. The defendant filed her answer and cross-complaint, in which she also asked a decree of divorce from the plaintiff. At the trial the plaintiff announced that he desired to proceed to trial upon the allegations of the cross-complaint, as it was not his purpose to proceed with the trial upon his complaint. No formal order was made dismissing the complaint and answer thereto. Upon the trial the plaintiff was found guilty of the charges made by the defendant and findings of fact and conclusions of law were regularly entered. When the six months period, provided by statute, had nearly expired, the defendant, the successful party in the action, filed her petition to set aside the findings of fact and conclusions of law; asked for a new trial; petitioned for leave to change the prayer from that of divorce to separate maintenance, and, in the event her prayer should not be granted, the action be dismissed without prejudice.

The plaintiff resisted the petition of the defendant, and also moved that a final decree be entered in favor of the defendant and against the plaintiff. The court set aside the findings of fact and conclusions of law, and also denied the plaintiff's motion to enter a final decree of divorce for the defendant, and dismissed the action. At page 360, this court, speaking through Mr. Justice Denison, said: "The first and principal assignment is that the court erred in setting aside the findings and conclusions and in denying plaintiff's motion for a final decree. We think the court was right. To refuse would be to force defendant, the innocent party, to take a divorce against her will. Milliman v. Milliman, 45 Colo. 291, 101 Pac. 58, 22 L. R. A. (N. S.) 999, 132 Am. St. Rep. 181. We do not agree with plaintiff in error that S. L. 1917, p. 184, §10 changes the law in this respect. We can see nothing to indicate such intention. Some other states hold likewise and some otherwise, but we agree with the principle on which this court rested the Milliman decision."

Upon an examination of the statute governing divorce actions, at the time of the Willoughby decision, supra, we find it contains this provision (S. L. 1917, p. 184): "If the findings of fact and conclusions of law have not been set aside within six months from the day on which they were filed, and no motion to set them aside remains unheard and undecided, the court shall grant a divorce to the party entitled thereto according to the said findings of fact and conclusions of law."

In *Johnson v. Johnson,* 78 Colo. 187, 240 Pac. 944, the facts stated disclose that the plaintiff wife brought an action for divorce against the defendant husband, and in her complaint relied upon an antenuptial agreement which she specifically asked the court to enforce as to alimony. The defendant filed a pleading denominated an answer, in which he admitted only the execution of the antenuptial agreement, and neither admitted nor denied the allegations of the complaint. Findings of fact and conclusions of law were regularly entered in favor of the

plaintiff, and sixteen months thereafter the plaintiff filed her motion asking that the findings of fact and conclusions of law be set aside so far as they pertained to alimony. The defendant filed two motions, one asking that her petition to set aside the findings of fact and conclusions of law be stricken, and the other, that a final decree of divorce be entered. Both motions were granted, and the final decree issued. While there is language in the opinion which would indicate that the court was approving the action of the trial court, in granting the decree upon motion of the defendant, yet, an examination will disclose the fact that the matter before this court was a "motion for alimony, suit money and attorneys' fees pending the proceedings in this court." And the order was "Motion denied." The statute, at the time of the Johnson decision, supra, is the identical statute under which this case is considered.

In 15 R. C. L. 577, section 10, we find the following: "10. Duty of Court to Render Judgment. * * * Not only may the court have authority, but it may be its duty, to render judgment either on the motion of the plaintiff or on motion of the unsuccessful party."

As authority for this statement, reference is made to *Carlson v. Benton,* 66 Nebr. 486, 92 N. W. 600. An examination of this case will reveal the fact that the plaintiff was the unsuccessful party in an action for damages, the jury returning a verdict for the defendants. The plaintiff had filed his motion for a new trial, which had been overruled, but no judgment entered. At a subsequent term of court, judgment was rendered at the plaintiff's request. The opinion, with reference to rendition of judgment, being as follows: "The judgment is the logical product of the prior proceedings in the case. With the record of such proceedings before it, the court not only had authority, but it was its duty, to render the judgment. It is also true the record shows that the judgment was rendered on the plaintiff's motion. The motion was made at a term subsequent to the term at which

his motion for a new trial had been denied. He had a right to a hearing in the court of last resort. A final judgment was necessary to that end. It would be a mockery of justice to deny him a hearing in this court because he asked the trial court to do that without which he could not obtain such hearing.''

■ This case can be easily and logically distinguished from the case at bar. It must be remembered that the instant case was tried as a non-contested action for divorce, and the plaintiff, so far as the record discloses, made no objection nor saved any exception to any ruling of the court, and could not, under the circumstances, be heard in this court, so far as any matter considered by the court at the time it made and entered its findings of fact and conclusions of law.

In the Carlson case, supra, the plaintiff had been diligent in presenting his matters to the court, and had made proper objections to entitle him to have his matter reviewed by the Supreme Court of that state; not so here.

In 19 C. J. 159, §402, in discussing interlocutory decrees and decrees nisi, we find the general statement: ''A plaintiff who has obtained an interlocutory judgment cannot be compelled by defendant to have a final judgment.''

The authority cited for this statement is *Bishop v. Bishop*, 82 Misc. 676, 144 N. Y. S. 143. The defendant, who was the unsuccessful party in a contested divorce action, moved for final judgment, or in the alternative, for an order vacating the interlocutory decree. This motion was opposed by the plaintiff. It would seem that there was no statute in force with provisions similar to ours. The court there said: ''The plaintiff opposes the granting of the final decree, stating that she does not desire to avail herself of the provisions of the interlocutory decree, and that since obtaining the same she has determined that it is better, for the sake of her children, that she condone the acts complained of and continue the

marital relation. It has been held in this state that under such circumstances the plaintiff cannot be required to divorce the defendant against her will. * * * The present unsettled status of the parties cannot, of course, be permitted to continue. The plaintiff must decide definitely upon one course or the other.'' An order was entered requiring the plaintiff to either accept the decree, or upon her failure so to do, the interlocutory decree would be vacated.

We are not unmindful of the fact that ultimately the question of public policy is for the legislature. When that policy is unequivocally declared the declaration binds the courts. In this jurisdiction many statutes, and an unbroken line of decisions, have established a given policy; i. e., the marriage relation lies at the foundation of our civilization: It is the promoter of public morals and the conservator of social order: Its continuance is favored and its dissolution frowned upon: The state itself is a party to every divorce action and no decree inimical to its interests will be granted: No one, having just grounds for divorce, is obliged to assert the same, or forbidden to withdraw such assertion when made: And no one, innocent of offense against the marital relation, is obliged to submit to its dissolution. That policy is not limited to Colorado. It is substantially the public policy on that subject of every state in the Union, and is in the main the predominating policy of the civilized world. The statute now under consideration, if literally enforced, would substitute for that policy one which frowns upon the marriage relation and favors its dissolution; which ignores the state as a party and favors the entry of decrees inimical to its interests; which forbids one who, having just grounds for divorce, has once asserted the same, from withdrawing that assertion; and which obliges one innocent of offense against the marital relation to submit to its dissolution. The inevitable conclusion from such a policy is that the marriage relation does not lie at the foundation of our civilization and is

not the promoter of public morals and the conservator of social order. Assuming that the legislature is not forbidden by the Constitution to make such a declaration of public policy, we can only say that it must be made in much more definite and unequivocal language before we will be willing to impute to that body a design so shocking.

The defendant in this case, because she delayed beyond the six months period fixed by statute, is placed in the identical position she would have occupied if it had been determined that she, instead of her husband, was at fault. He is placed in the advantageous position of securing what he desired, and the very thing to which he would have been entitled had he been found to be the injured instead of the injurying party, for it was the husband who commenced this action, and forced the defendant to occupy the unfavorable position of either permitting him to secure a divorce from her, upon grounds that did not exist, or come into court and place herself in the humiliating position of alleging and proving the husband's shortcomings. It is obvious that if she had but filed an answer denying the charges of her husband, that she could not have been compelled, upon proof of his dereliction, and her innocence, to accept a decree, and why should he then be placed in a position to compel her to accept one for which she asked, and which she does not now desire.

The guilty party's standing in court does not commend him to its favorable consideration. It may be said that he is neither married nor divorced, and that may be true, but he is the victim of his own wrongdoing, and if he is compelled to continue throughout life in this unenviable position, it must be remembered that it is due to his, and not the defendant's fault. The unsettled and unsatisfactory position of the plaintiff, with respect to his marital relations, is no better or worse than it would have been had the defendant insisted upon her rights under her original cross-complaint, praying for a decree of separate maintenance, which is a remedy authorized by

statute for one who has just cause for complaint against an unfaithful spouse.

The act in question is so mandatory in its provisions that there can be no discretion whatever exercised by the court. For the purpose of illustration, assuming that findings of fact and conclusions of law have been entered in an action between husband and wife, and immediately thereafter the parties again resume the marital relation, but neither files a motion to set aside the findings within the period of six months, and under these circumstances, either party should ask the court to enter its decree, and should openly admit that since the findings they had cohabited and fully consummated the relationship of husband and wife, would it be possible for either spouse to obtain a decree under this statute? No court in the land, exercising equitable powers, would for a moment hesitate to set aside its findings under the conditions just mentioned, and to do otherwise, would shock the sense of decency of all mankind.

(b) Article III of the Constitution of the state of Colorado reads: ''The powers of the government of this state are divided into three distinct departments—the legislative, executive and judicial; and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any power properly belonging to either of the others, except as in this constitution expressly directed or permitted.''

The statute in question, it will be observed, leaves no discretion whatever in the courts, and by it the legislature has undertaken to direct a court, exercising equity jurisdiction, when, to whom, and at whose behest its decree shall be granted. The legislature has, by its statute, virtually determined that the equities of the case shall be disregarded, and that the guilty shall stand on an equality with the innocent. It will be conceded that the legislature may abolish all divorces, and thus deprive the courts of jurisdiction in these cases, but when the legisla-

ture has enacted its statute prescribing the grounds of divorce and the steps necessary to be taken to give the court jurisdiction, it has fully discharged its duty and completely exhausted its powers. When the court has once acquired jurisdiction, it must be left to determine the case and issue its decree in accordance with the well-established rules prevailing in that jurisdiction. The legislature may, in its wisdom, provide that no decree shall issue within a certain period, but when it undertakes to determine, that after the expiration of that period, the guilty have been completely absolved from the consequences of their guilt, and can then demand the court's decree, either with or without the express opposition of the innocent, it has over-stepped.

An examination of the reports in those states having statutes similar to ours fails to disclose that any determination of the constitutionality of the statute, with reference to the encroachment upon the judiciary by the legislature, has ever been raised. We are aware that in *Parsons v. Parsons,* 70 Colo. 154, 198 Pac. 156, the constitutionality of a statute similar to this was in question, and that we then held the statute constitutional. In so far as the opinion in the Parsons case, supra, is in conflict herewith, it is expressly overruled.

The statute in question directs the doing of a judicial act, and prescribes the method of doing it. It directs, in unequivocal terms, that the court shall grant a divorce to the party entitled thereto upon the motion or application of either party to said suit or action. The granting of the decree of divorce is not a ministerial act, for it is to be done by the court, and so it is a direction to the court to do an act which, without the statute, the court should not, and probably has not the power to, do. It compels the court to grant a divorce to an unwilling suitor because the other party to the action desires the innocent and unwilling suitor to have that to which she has been declared to be entitled.

In *Gloyd v. Superior Court,* 44 Cal. App. 39, 42, 185

Pac. 995, it is said: "From the law as thus settled and determined it becomes clear that the entry of a final decree of divorce is a judicial act and not merely a clerical act consequent upon a previous judicial act."

In Colorado the statute, by its direct terms, requires the court to act after the six months' period has expired, and it would therefore seem plain that in so doing it is requiring a judicial act, and yet, under its terms there can be no judicial discretion, nor can the court do otherwise than grant the decree to the party entitled thereto, upon the application of the party clearly not entitled to relief.

In *Olson v. Superior Court,* 175 Cal. 250, 251, 165 Pac. 706, Josie Olson sued and obtained an interlocutory decree of divorce from Albert Olson, the interlocutory decree being entered on May 13, 1910. Thereafter, and in February, 1911, the wife, at the solicitation of the husband, became reconciled, and returning to his home, resumed the marital relation. They continued to thus live for a period of five consecutive years, and on February 21, 1916, the husband secretly caused a final decree of divorce to be entered. This decree the wife caused to be set aside on her application, made within six months from the date of its entry. Thereafter, the husband again petitioned for a final decree, and upon the court's refusal to grant it, brought this action in mandamus. The statute of California, Civil Code, Deering, 1915, section 132, in force at that time, and which the court construed, reads as follows: "When one year has expired after the entry of such interlocutory judgment, the court on motion of either party, or upon its own motion may enter the final judgment granting the divorce."

The court held "That the word 'may,' as thus employed in the statute, means 'must' whenever the facts are shown entitling the movant to such final decree requires no discussion. Petitioner's argument is based upon the proposition that when one year has in fact elapsed the right is absolutely final. * * * Under our

divorce laws the interlocutory decree fixes the right of the blameless spouse to a decree of divorce as and of the time when the interlocutory decree itself is given. * * * all matters therein litigated have passed beyond the possibility of future litigation, but it is never to be forgotten that the interlocutory decree does not sever the marital bonds. It is merely a declaration that one of the spouses has at that time established a right to a final decree which will be entered at and after the expiration of one year. (Estate of Dargie, 162 Cal. 51, [121 Pac. 320].) * * * They lived together as husband and wife continuously for five years thereafter, at the end of which time the condonee, not the condoner, demands of the court the entry of the final decree severing the bonds of matrimony between himself and his wife, with whom he had thus been living. From its very nature the interlocutory decree can only operate upon facts existing down to the time it is given. It is within the contemplation of the law that facts subsequently arising should have their influence in determining the right to a final decree. While in every proper case a trial court will, and if necessary by mandate will be compelled to, enter such a final decree, it would be a grave reproach to our jurisprudence to hold that our law ever contemplated that such a decree could be forced upon a blameless and nonconsenting wife after such a reconciliation. Our law demands no such thing. It never designed to make itself an instrument of such frauds. The similar law in the state of New York entitles either spouse to a final judgment after three months 'unless for sufficient cause the court in the meantime shall have otherwise ordered,' and under that statute the court refused a final decree where a reconciliation was effected such as is here shown. (Cary v. Cary, 144 App. Div. 846, [129 N. Y. Supp. 444].) But in the absence from our statute of this express language found in that of New York, the power of our courts is no different. The New York statute but expressed the power which our courts in equity inherently possess. They have

under our present statute and without express authorization the power to recognize condonations and reconciliations such as are here shown and to do justice to the litigants as may be demanded by such events in their lives as have arisen subsequent to the entry of the interlocutory decree and before the expiration of the fixed period of one year.

"It would, in our view, be superfluous to elaborate upon a proposition so plainly consonant with the principles of equity and the due administration of justice."

It will therefore be noted that in California, while the word "may" as used in the statute is construed to be mandatory, that even then courts of that state use some of the equity powers inherent in general courts of equity to avoid the consequences of the mandatory provisions of the statute. In other words, the courts do as equity and good conscience dictate.

In Colorado the statute is mandatory, and by no possible construction can discretion be read into it. When, we might ask, does equity and good conscience, and a true conception of the marriage relation, justify a court exercising equity jurisdiction in granting a decree of divorce to an unwilling spouse because the other spouse, being found at fault, desires to be rid of the marital obligation? If the statute in Colorado is to be given its literal interpretation, neither fraud, collusion nor cohabitation, such as was found in the California case, could be considered by the court. It may be that the legislature was unfortunate in the use of the language employed, but if that be so, it is for it to correct rather than the courts to legislate by judicial interpretation.

▪▪▪ (c) It may be said that the granting of the final decree is a matter of procedure, and therefore the legislature has the right and power to regulate it by its enactments. The Gloyd case, supra, clearly and definitely settles this matter, and a reading of our statute would seem conclusive upon this point. However, if the signing is a matter of procedure, it is, perhaps, exclusively a

matter for the courts themselves. We seriously question the power of the legislature to make any rules or to enact any laws relative to procedure in courts. It is doubtful if the legislature in Colorado could have enacted any law with reference to procedure in courts of record unless that power had been expressly or tacitly surrendered to it by the judiciary. Assuming, but not admitting, that the judiciary had so lost its right, or had so surrendered it, or a part of it, to the legislative branch of government, so that the two exercised it concurrently, that can not now be the law in Colorado, for in 1913 the legislature expressly enacted a law recognizing the right of the courts to make rules with reference to procedure. The statute being as follows (S. L. 1913, p. 447, chapter 121.) : ''The Supreme Court shall prescribe rules of practice and procedure in all courts of record and may change or rescind the same. Such rules shall supersede any statute in conflict therewith. Inferior courts of record may adopt rules not in conflict with such rules or with statute.''

In conclusion, we hold that the court below had jurisdiction, and it was its right and duty to make any changes in its orders, respecting future payments to be made by the plaintiff to the defendant, as might be necessary by reason of the changed condition of the parties. We further hold that in so far as the amendatory act of 1925 attempts to empower and direct the court to issue its decree upon application of the guilty party to a divorce action, and only so far, it is not only against public policy, but is unconstitutional. We do not hold, and must not be understood as holding, that in a case where a decree is withheld for an unreasonable time, and the defeated party has rights which he wishes determined upon review, that he cannot have an order of court requiring the successful party to either accept the decree or the dismissal of the action.

The judgment is therefore reversed and the cause remanded to the court below, with instructions to set aside the final decree and reinstate the findings of fact and con-

clusions of law, and for such further proceedings as are not inconsistent with the views herein expressed.

Mr. Justice Butler dissents.

Mr. Justice Butler dissenting.

1. The majority opinion declares the provision in the amendatory act of 1925, requiring the signing of a divorce decree upon application of the unsuccessful party, to be unconstitutional as a usurpation by the legislature of powers belonging exclusively to the judiciary. In doing so, the court declares that it expressly overrules the recent case of *Parsons v. Parsons*, 70 Colo. 154, 198 Pac. 156, so far as that decision conflicts with the present one. As we shall see, to justify a reversal of the judgment in the present case, much more is necessary.

The act in question is a mere matter of procedure. Such matters are within the control of the legislature. *United States v. Union Pac. R. R. Co.*, 98 U. S. 569, 25 L. Ed. 143; *Wayman v. Southard*, 10 Wheat. 1, 6 L. Ed. 253; *Bank of United States v. Halstead*, 10 Wheat. 51, 6 L. Ed. 264; 1 Lewis's Sutherland, Stat. Const., §§88, 89.

This court has rendered decisions that are guides to a correct conclusion with reference to this feature of the case.

Section 186 of the Code of Civil Procedure provides that where, in an action arising upon contract for the recovery of money or liquidated damages only, the defendant defaults, the clerk of the court, upon plaintiff's application, shall enter the default of the defendant, and immediately thereafter, if the complaint is verified, "enter judgment for the amount specified in the summons." In *Phelan v. Ganebin*, 5 Colo. 14, we held that this provision is not in conflict with the Constitution as an invasion of the province of the judiciary; the theory being that "the judgment is the sentence which the law itself pronounces as the sequence of statutory conditions.

\* \* \* the *statute directs the judgment.* \* \* \* And the judgment, though in fact entered by the clerk, is, in the consideration of the law, what it purports on its face to be, namely: the act and determination of the court itself." We called attention to. the fact that "the courts of many of the states have acted under similar statutory provisions for many years past," and "the validity of such judgments has been upheld by repeated decisions of the highest courts of the Code states."

In *Corthell v. Mead,* 19 Colo. 386, 35 Pac. 741, we had under consideration the provision of a statute (now C. L., sec. 6075) requiring a justice of the peace to enter judgment upon the verdict of a jury, "according to the finding thereof." A verdict was received and recorded by the justice of the peace, but he refused to enter judgment upon the verdict. We held that he had no discretion in the matter; that it was his duty to enter the judgment as commanded by the legislature. It will be observed that in such case, as in the Phelan case, supra, no judgment is *rendered;* it is merely *entered,* and when entered the legislature makes it a judgment, of the court in one case, and of the justice of the peace in the other.

In *Parsons v. Parsons,* 70 Colo. 154, 198 Pac. 156, we held that section 10, chapter 65, S. L. 1917, providing that the death of either party to a divorce proceeding before the expiration of six months after the findings of the court are made and before entry of the decree, shall operate automatically to grant an immediate divorce to the party entitled thereto, is not an invasion by the legislature of the province of the judiciary, and is constitutional. There, as here, the divorce was granted without the wife's request, other than that contained in the prayer in her pleading, and there, as here, she claimed that such divorce was invalid.

The Code (§165) provides that when the court finds that the emergency alleged for the purpose of securing a restraining order, without notice, did not exist, or, if existing, was brought about by the act or omission "of

or for the plaintiff, or by his knowledge," the court shall thereupon dismiss the complaint without respect to the merits thereof, and shall "summarily enter judgment on said emergency bond for the defendant and against the plaintiff and his sureties" for the amount designated therein. In *Cary v. Mine and S. Supply Co.*, 53 Colo. 556, 129 Pac. 230, the trial court found that the emergency alleged did not exist, but refused to enter judgment on the emergency bond, because of the belief that the provision of the Code requiring the entry of such judgment violates the Constitution. We held that it was the trial court's duty to enter such judgment, saying, among other things: "While the constitution, except as therein otherwise provided, vests the judicial power of the state, as to matters of equity, in certain designated tribunals, and such other courts, as may be prescribed by law, it, in no wise, inhibits legislation prescribing the procedure by which the jurisdiction is to be exercised, unless the regulations adopted substantially impair the constitutional power of the court, or practically defeats its exercise. * * * Indeed, the right in that respect has been exercised by the general assembly since the organization of the state, and particularly as to injunctive procedure and relief."

The Code of Procedure of 1887, in section 272, provided that upon payment of costs, and upon application of the party against whom judgment in ejectment has been rendered, "the court shall vacate such judgment and grant a new trial * * *." This legislative provision, together with the amendment of 1895 (S. L. c. 62), we have held to be mandatory upon the courts of this state. *Schwed v. Hartwitz*, 23 Colo. 187, 47 Pac. 295. And the Supreme Court of the United States has held it to be binding upon the Federal courts. *Equator Mining & S. Co. v. Hall,* 106 U. S. 86, 1 Sup. Ct. 128. See also *Campbell v. Iron Silver Mining Co.* (C. C.), 56 Fed. 133; *Shreve v. Cheesman* (C. C. A.), 69 Fed. 785; *Campbell v. Iron Silver Mining Co.* (C. C. A.), 83 Fed. 643.

For other examples of legislative regulation of judicial procedure, see the Codes of Civil Procedure of Colorado and other states, particularly the New York Code, which contains elaborate and minute regulations.

As we have seen, the Supreme Court of the United States does not entertain the doubt expressed in the majority opinion concerning the power of the legislative department to enact laws relative to court procedure. That great court does not base its holding upon any supposed surrender of such power by the judiciary; it does not seem to have occurred to the court that any power conferred by the Constitution upon the courts can be surrendered by the courts to another department.

2. But, says the majority opinion, assuming "that the judiciary had so lost its right, or had so surrendered it, or a part of it, to the legislative branch of government so that the two exercised it concurrently, that can not now be the law in Colorado, for in 1913 the legislature expressly enacted a law recognizing the right of the courts to make rules with reference to procedure"; citing S. L. 1913, ch. 121, p. 447. If the right to make rules is derived from the legislature—and, in my opinion, there is no doubt that such is the case—the same or any succeeding legislature can take away, limit or qualify the right so conferred. That is precisely what the legislature did, so far as divorce actions are concerned, when it passed the amendatory act of 1925. That the right to make rules of procedure is derived from the legislature, and that conferring such right is an exception to the rule that legislative power can not be delegated, see *United States v. Union Pac. R. R. Co.*, supra; *Wayman v. Southard*, supra; *Bank of United States v. Halstead, supra;* Lewis's Sutherland, Stat. Const., secs. 88, 89.

3. In part "2-a" of the majority opinion, discussing the constitutionality of that provision of the amendatory act of 1925 that is under consideration, it is said that the act "is so mandatory in its provisions that there can be no discretion whatever exercised by the court"; and

suggests that if it should be made to appear that since the trial or hearing the parties immediately resumed marital relations, no court would grant a decree or hesitate to set aside its findings. The inference drawn by the court seems to be that a statute attempting to compel the court to do what no court would do, and to refrain from doing what no court would hesitate to do, must be unconstitutional. That result does not follow. In the case supposed, the act in question would not prevent a court from dismissing the case. The court would not merely refuse to grant a decree, but would dismiss the case; it would not merely set aside the findings, thereby permitting the case to remain in court. Above all things, the court would not retain jurisdiction of the case for the purpose of compelling one party to the fraud to specifically perform his contract with the other party to the fraud. The same course could, and would, be pursued if it should be made to appear that there had been collusion. The courts have ample power to protect themselves against an attempted fraud upon the court, and nothing in the provision in question would prevent the exercise of that power.

4. The statutory provision in question is declared by the court to be unconstitutional. It does not follow that the judgment should be reversed. In the absence of that provision, two questions are presented. Had the trial court power to sign the decree upon the application of Walton? If it had the power to do so, did the court commit error in signing the decree?

(a) As to the power. Notwithstanding a dictum to the contrary in *Curtis v. McCall,* 79 Colo. 122, 123, 244 Pac. 70, it seems that before the amendatory act of 1925 was passed, a court had *power* to enter judgment upon application of the unsuccessful party. Such a party may desire to pay the judgment and have satisfaction thereof properly entered upon the records of the court; or he may wish to have the proceedings reviewed by the Su-

preme Court, and this can not be done in the absence of a judgment.

In *Life & F. Ins. Co. of New York v. Wilson,* 8 Peters (33 U. S.) 291, 81 L. Ed. 949, the Supreme Court of the United States ordered the issuance of a peremptory writ of mandamus, commanding the trial judge to sign a judgment, saying (p. 304): "Until his signature be affixed to the judgment, *no proceedings can be had for its reversal.* He has, therefore, *no right to withhold his signature,* where, in the exercise of his discretion, he does not set aside the judgment. *As well might a judge refuse to enter up the judgment upon a verdict,* which he would not, or could not, set aside, as to withhold his signature in the present case."

In *Carlson v. Benton,* 66 Neb. 486, 92 N. W. 600, judgment was rendered upon request of the unsuccessful party. The following is quoted from the opinion (p. 492): "The judgment is the logical product of the prior proceedings in the case. With the record of such proceedings before it, *the court not only had authority, but it was its duty,* to render the judgment. It is also true the record shows that the judgment was rendered on the plaintiff's motion. * * * He had a right to a hearing in the court of last resort. *A final judgment was necessary to that end.* It would be a mockery of justice to deny him a hearing in this court because he asked the trial court to do that without which he could not obtain such hearing."

In *People, ex rel., v. Graham,* 16 Colo. 347, 26 Pac. 936, a divorce suit, a verdict was rendered in favor of the husband. A motion for a new trial was overruled. The judge, however, found that the wife should be awarded $5,000 as permanent alimony, but refused to enter judgment unless the husband first paid $1,000 of that amount. The judge prepared a written decree, inserting that condition, but refused to sign the decree because the husband had not paid the $1,000. Upon original application by the husband, we ordered the issuance of

a peremptory writ, commanding the district judge to sign the decree. In the opinion, we said (p. 348) : *"The case had already proceeded to a stage at which it became the duty of the court to enter a final decree from which an appeal could be taken.* * * * The district court, by its conduct, is placed in the attitude of *refusing to proceed to judgment* in the cause. While the writ of mandamus can not be used to control judicial discretion, it may properly be invoked to command a subordinate court to proceed to judgment as is prayed in this case." It will be observed that the husband was the unsuccessful party to the extent of a $5,000 judgment against him. See also 15 R. C. L., p. 577.

The present case also had proceeded to a stage where nothing remained to be done but the mere signing of the decree. The case had been tried; all questions of fact and all questions of law had been decided; the question of alimony and the question of the custody and support of the children had been determined; the findings of fact and the statement of the conclusions of law had been made, and were on file for over six months, and the motion to set them aside had been denied. In such circumstances, if the trial judge had refused to sign the decree upon the application of *either* party, this court, in a proper proceeding, could, and should, have ordered him to sign the decree, even if the amendatory act of 1925 had not been passed.

In *Utah Association of Credit Men v. Bowman,* 38 Utah 326, 113 Pac. 63, involving a Code provision requiring the clerk of the court to enter defaults, and also judgment thereon, this pertinent language occurs in the opinion (p. 332) : "Every judgment may be viewed in a double aspect. In one view a judgment represents the result of the mental operation of someone clothed with the legal power to hear and determine questions of fact or mixed questions of law and fact. The final conclusion or result arrived at after considering the facts and circumstances submitted to such a person, may be called

the judgment. In arriving at the result the person pronouncing judgment no doubt acts judicially. Such a judgment, therefore, is the result of some mind acting judicially; * * * In another aspect a judgment may not require any mental operation at all. In case the facts and conditions upon which the judgment is based are conceded or not disputed, the law may direct what the judgment shall be, and in such event may also designate the person who shall enter the judgment which the law directs. Such a judgment, like the one pronounced by someone with authority, is also entered so that it may be enforced. The latter judgment, however, is not based upon the result obtained by consideration of and weighing conflicting or disputed facts, but is directed by law upon conceded or undisputed facts. The person entering such a judgment, therefore, acts merely as the agent of the law, and in doing so acts in a ministerial and not in a judicial capacity.''

This case is cited because it shows the double aspect in which a judgment may be viewed. Of course, where all questions of fact and of law have been decided, the case, for the purpose of the present discussion, is similar to a case where the facts are undisputed; nothing remains for decision, for true judicial action, for the exercise of discretion.

In *Rhodes v. Board of Public Works,* 10 Colo. App. 99, 49 Pac. 430, involving the question of the discretion of the board of public works, the court held that, ''Where any tribunal in which discretionary power is lodged, has exercised its discretion so far as necessary in a particular case, and has given its conclusions upon the facts before it, the performance of what remains to be done, being merely ministerial, may be compelled by mandamus.''

It is not a satisfactory answer to the argument in this paragraph to say that it does not appear that Walton wished to sue out a writ of error, or that he ''made no objection nor saved any exception to any ruling of the court, and could not, under the circumstances, be heard

in this court." The question now being considered is whether the court had *power* to sign the decree upon the application of the unsuccessful party. The tacit admission in the majority opinion that if Walton had made objection and saved exceptions, he would be entitled to have the decree signed, so as to enable him to sue out a writ of error, is a concession that the court had the *power* to sign the decree.

(b) Did the court, in signing the decree, commit reversible error? As we have seen, the court had the power to sign. Whether it was wise or unwise to sign, and whether one of us, if on the district bench, would have signed or would have refused to sign, are questions with which we are not permitted to concern ourselves. In paragraph "2" of the majority opinion it is assumed that the court below proceeded under the provision held by this court to be unconstitutional. The trial judge did not say so; and we are not justified in assuming that he refrained from exercising his judgment in the matter, and signed the decree in obedience to such provision. This court declares that the provision is unconstitutional; which means, of course, that its conflict with the Constitution is so clear as to be beyond any reasonable doubt. An act that is in conflict with the Constitution is not a law. All persons are presumed to know the law. As judges are not excluded from the operation of that salutary presumption, we must assume that the trial judge did not consider himself bound by a provision, which, being unconstitutional, is not the law, but exercised his judgment, based upon the law and the facts. The presumptions that appellate courts are permitted to indulge are those that uphold, not those that destroy, the judgment. There is a presumption of regularity in the proceedings in trial courts.

A wife files a cross-complaint for divorce. Before the hearing, desiring, for her own sake or for the sake of the children, to maintain the family relation, the continuance of which is favored by public policy, she applies

to the court to dismiss her complaint. The court refuses her application, and forces her to proceed with the case. At the hearing, the court, over her protest, finds the issues in her favor. Within six months thereafter she applies to the court to dismiss her suit; but a merciless judge, acting under a tyrannical law, refuses to dismiss the case, and, ignoring her appeal, signs a decree severing the bonds that she had struggled to preserve. Such a case would deserve much that is said in the majority opinion, but it is *not* this case. The judge who signed the decree has an established and deserved reputation as a lover of fair play, alert to protect the "under dog." He acted upon consideration of all the circumstances disclosed by the record. The law, far from being tyrannical, throws around the wife every reasonable protection. It provides her with suit money and attorney's fees, and with alimony, both temporary and permanent. If she wishes to dismiss her complaint before the trial, the law permits her to do so. The law even gives her six months after the filing of the findings of fact and the statement of the conclusions of law in which to determine whether to dismiss her complaint or allow the case to proceed to a decree. If she decides to dismiss, the law permits her to do so without assigning any reason, and without regard to her reason; and neither the husband nor the court can prevent the dismissal. Her alimony award can be secured by making it a lien upon the husband's property, or it can be enforced by execution against his property. If the failure to pay it is contemptuous, the husband, upon the wife's application, can be confined in jail among common criminals. Even after the decree is signed the court has power to increase the periodical installments of alimony when changed conditions make it necessary and just to do so. All this the law provides—and justly so—for the protection of the wife. It would seem, therefore, that the law does not place a wife in the helpless situation that one reading the majority opinion might suppose. Nor has Mrs. Walton

been placed in any such helpless situation. In the first place, she need not have changed her cross-complaint from one for separate maintenance to one for divorce. She had able counsel, and there is evidence that her brother and another were "very largely instrumental" in getting the property settlement contract drawn. Partly because of the advantage to be derived by her from having the contract signed, and also because she desired a divorce, she elected to sue for a divorce. In her amended cross-complaint she abandoned the charge of adultery, and sought a divorce on the ground of mental cruelty. I call attention to this fact in justice to Walton and out of consideration for the children. One reading the majority opinion might infer that Walton was found guilty of adultery. Such is not the case. The law expressly forbids the signing of a decree within six months after the filing of the court's findings of fact and conclusions of law. This provision is made for the purpose of giving the parties time for calm reflection, with the hope and expectation that, for their own sakes or for the sake of their children, the parties may become reconciled and dismiss the case; or, if there is no reconciliation, that the plaintiff may think better of the matter and dismiss her complaint. In this case Mrs. Walton stands in the position of a plaintiff. In her pleading she prays for "a decree of absolute divorce." As long as that pleading stands, that prayer for divorce stands, and she is asking the court to decree a divorce. Without withdrawing that prayer, without dismissing her cross-complaint, she objects to the court's signing the very decree for which she prays. This she does, not because she does not want a divorce, not because she desires to preserve the family relation, but because, and only because, she wishes to hold up the signing of the decree for the time being as a threat or security to compel Walton to perform literally all of the terms of the settlement agreement. That agreement provides that Walton shall pay certain indebtedness contracted by Mrs. Walton before the suit was com-

menced (approximately $900); that he shall purchase from Mrs. Walton her equity in the house occupied by the family, the mortgage thereon with interest to be assumed by him; that he shall pay all taxes; that he shall pay the agreed price of $6,000 for her equity in monthly installments of $50 with interest; that he shall keep the house insured; that he shall have possession of the house; that Mrs. Walton shall have all the furniture in the house except one clock; that Walton shall pay to Mrs. Walton $100 per month as alimony, and $50 per month for the support of each child in her custody, such alimony to be increased a certain percentage as his income increases; that he shall assign to her certain life insurance policies for the aggregate sum of $15,000; that he shall pay certain surgeons' and physicians' bills; that Mrs. Walton shall have custody of two of their four minor children, and that Walton shall have custody of the other two; that he shall pay all court costs and witness fees; and that he shall pay to her attorney such sum for his services as the court shall allow. The home property referred to had been purchased by Walton with money inherited by him, and had been conveyed to Mrs. Walton. Walton performed every one of the conditions imposed upon him by the agreement, with the following exceptions: Walton had failed to pay interest due upon the loan secured by mortgage on the house, amounting to $75; back taxes on the property, amounting to $160; and a balance of $356.25 due on the $750 awarded Mrs. Walton for her attorney's fee. Because of this failure, Mrs. Walton asked that the court order that Walton pay these amounts within a time specified or be committed to jail. After an extended investigation of Walton's financial condition, the court refused the application, finding that Walton "has made an honest effort and in good faith attempted to comply with his certain contract as embodied in the findings of fact and conclusions of law herein, but the court further finds that he has been unable to do so

on account of a material change of condition since the 23rd day of November, A. D. 1927.''

Prior to this decision, there was no warrant for making the withholding of a judge's signature from a divorce decree serve the purpose of a chattel mortgage. The possibility that such a procedure may be resorted to may account for the enactment of the statutory provision that is stricken down by this decision.

To sum up, it is my opinion that the questioned provision in the amendatory act of 1925 is not unconstitutional, and that it was the judge's duty to sign the decree; that, assuming the unconstitutionality of that provision, the trial court had power to sign the decree, and that his doing so in the circumstances disclosed by the record was not reversible error, but was a proper exercise of judicial power. Reason and authority, it seems to me, require the affirmance of the judgment. But this court reverses the judgment and directs the lower court to set aside the decree. The logical result is that a chattel mortgage, so to speak, will come into existence, and will continue in force until the mortgagee graciously permits the trial judge to sign the decree. In the meantime, Walton is forced to occupy the ambiguous position of being married, and yet not married; or, to quote a homely saying, of being ''sort of married and sort of not, but more sort of not than sort of.''

As I entertain the foregoing views, it seems desirable to add one more to that goodly company known as dissenting opinions. A dissenting opinion is not always useless. It may, and sometimes does, induce an ultimate return to correct legal principles. On the other hand, if it impresses the profession as being unsound, it will have the effect of strengthening the decision. In either case, the dissenting opinion serves a useful purpose.

*On Rehearing*

*En Banc.*

Mr. Justice Alter.

The plaintiff was found guilty of cruelty, and not adultery, as inferentially stated in the opinion.

It has been suggested, on the application for rehearing, that our statement concerning the subject of practice and procedure casts a doubt upon the validity of the entire Code of Civil Procedure. It was not so intended. No doubt of the validity of that code is entertained.

Rehearing denied.