Affirming.
A paper, probated as the will of Arzell Guffy, was successfully contested, and the contestees have appealed. This paper was written on July 19, 1922. Squire Guffy died August 8, 1923. He had been married twice. He had three children. His oldest child was the contestant, Eunice I. Gilliam, who was 38 years of age when this case was tried, and whose mother had died when she was about six months old. Her father soon remarried, and his second wife bore him two children, Judge A. Clyde Guffy, who was 34 years old at the time of this trial, and James Guffy, who was then 28. By the terms of this paper, all of Squire Guffy's property of every kind, was left to his wife, Annie Guffy, during her life, and at her death, $50.00 was to be paid to his daughter, Eunice I. Gilliam, and the property then left was to be divided between Judge Clyde Guffy and James Guffy, Clyde to have 3/5 and James to have 2/5. Squire Guffy's estate amounted to about $12,000.00. Mrs. Gilliam and James Guffy contested this paper, and the widow, Mrs. Annie Guffy, and Judge Clyde Guffy are the contestees.
Squire Guffy had been seriously afflicted for many years. About ten years before his death, he was repairing a barn, and while so doing, a piece of scantling fell *Page 806 
and struck him on the head. In a short time his thumb began to jerk and this jerking spread to and soon involved his whole body. The physicians say he had a case of paralysis agitans. He walked with difficulty, shuffled his feet and could scarcely pick them up. He would have to hold his hands together, either in front of him or behind him when he walked, and as he did so, would gradually get faster, leaning forward and increasing his speed to keep from falling, until he would get into a shuffling run. He had been a very large, florid complexioned man. He lost his flesh; became slender; his face was blank and vague looking; wrinkled, pale and his eyes had a vacant look. The veins in his face were very prominent. In later years, his tongue hung out of his mouth, and the jerking affected that as well as the rest of his body. Saliva would run from his mouth. He could scarcely converse at all, and had difficulty in talking so any one could understand him. There is evidence that his memory became short; that he could not remember things that happened the day before; that he got lost in his room and could not remember the way out; that he would try to go through a door, and instead of pulling it open, would be closing it; that he would start to the dining room, but would go into the hall. He had not been able to dress himself for years.
On the other hand, a dozen witnesses, called by the contestees, testified generally to the same condition which we have outlined, but further testified that they did not think Squire Guffy's mind was affected at all.
The execution of the will was duly established. There is no dispute about the instructions, and but one ground for the reversal of this case is urged on this appeal. That is that the verdict is flagrantly against the evidence.
Mrs. Gilliam made her stepmother the storm center of this controversy. She and her stepmother have never gotten along well. Mrs. Gilliam inherited something over $2,000.00 in money through her mother. Her father was appointed as her guardian. She also inherited a tract of land. Those who desire to find the roots of this controversy should read the case of Gilliam v. Guffy, 142 Ky. 631, 134 S.W. 1162. Mrs. Gilliam married in 1908. Her marriage displeased her father, and when she and her husband came home after the marriage, her father would not allow Mr. Gilliam to come into the house. We must admire Mrs. Gilliam's loyalty to her husband in proudly *Page 807 
insisting that if her husband was not welcome, she did not desire to be welcome. The suit of Gilliam v. Guffy was begun shortly after that marriage. Her father had induced her to convey him her land for $400.00. Before bringing this suit, site offered to return this $400.00, which he refused to accept. In her suit, she asked that this deed be cancelled; that voucher No. 9, be reformed and reduced to $994.20 or that her father be required to pay her the $200.00 which he had lacked of paying the amount called for in that voucher. She alleged that she had received no money on voucher No. 7, and she asked judgment against her father for $500.00 on that account. The father reconveyed the land to her and subsequently she sold it for about $3,500,00. He paid her the $200.00 balance on voucher No. 9. He resisted the payment on voucher No. 7. The pleadings and proof in that old case were introduced in evidence in this case, and read to the jury. The father had insisted that he had paid Mrs. Gilliam this $500.00 represented by voucher No. 7, in money, and that no one was present but those two. When asked how he came to do this when no one was present but the two, he said:
 "Her stepmother didn't understand why it was I was paying her the money and she was mad about it, and she and her stepmother were not on very good terms.
The contestees are now contending that this deposition of Squire Duffy, given more than 13 years before, should not have been read on this trial, and that it was incompetent; but it was competent, and contestees can not raise that question now anyway, as they made no objection when the evidence was offered. They insist that this evidence was damaging, and we agree with them, for it showed that then there was bad feeling between the stepmother and Mrs. Gilliam, and it showed that the father, Squire Duffy, then in full health and vigor, stood in such awe of the stepmother that he was unwilling for her to know that he was paying to Mrs. Gilliam what he honestly owed her. Mrs. Gilliam was about ten years old when her brother, James, was born, and her late childhood and early womanhood was devoted to nursing and caring for him. He became devoted to her, and rewarded her care and kindness by joining in this contest and by his testimony in this case. Although by the will he was given 2/5 of this estate, and if the will is broken he will *Page 808 
only receive 1/3, yet in spite of that, he testified against his interests and his testimony is, aside from the old deposition of Squire Guffy, the strongest evidence we have against this paper. He testified that his father frequently had him compute the interest on his notes and that in going over them he would find notes that his father did not know he had. He testified that he called to see his father about a year before his death, about the time the will was written, and his father did not seem to know him. He testified that his father did not have sufficient mind to make a will, and to dispose of his property according to a fixed purpose of his own, and when asked what he based that on, he said, "The general condition of his health and mental ability." He testified that his father had become so enfeebled that he had become docile as a child, and would do anything that any one told him to do; that a few years before this will was written, he and his father were talking, when his mother came in and told him she wanted him to take his father to town to have his will written, and the mother then outlined how the will should be written, and it was practically the same as the paper offered. The father stood by and said not a word. In the case of Walls v. Walls, 30 Ky. L. R. 945, 99 S.W. 969, we said:
 "Direct proof of undue influence can seldom be had. Like fraud, it must be proved ordinarily by circumstances, and, though each circumstance standing alone might be quite inconclusive, yet the effect of all the circumstances when taken together may be more convincing. It has often been said that, if under all the circumstances of the case the will is unnatural in its provisions and inconsistent with the obligations of the testator to the different members of his family, the burden rests upon the propounders to give some reasonable explanation of its unnatural character."
 This case was cited with approval in McKee v. Brame, 176 Ky. 302, 195 S.W. 473. Further in the Walls case, we find:
 "Incapacity opens the door to undue influence, and when opportunities for such influence are shown, and the favored devisees are the beneficiaries of a will unnatural in its provisions, to the exclusion of others having equal claims at least upon his bounty, *Page 809 
very slight circumstances are sufficient to make the question of undue influence one for the jury."
The evidence shows that Squire Guffy had been above the average man in point of intelligence, but he had before him for solution the problem of doing justice among his children, the usual difficulties of which were in his case complicated by the fact that they were not all born of the same mother. A wise Providence has placed in the breasts of all mothers a jealous solicitude for the welfare of their offspring. This is necessary for their preservation, but this feeling, if not carefully watched and religiously restrained, becomes a source of unhappiness to the offspring of other mothers, often seen in the human race in the case of stepmothers, and Mrs. Gilliam appears to have been in this case the victim of this misguided maternal instinct upon the part of her father's second wife. We see instances of such in everyday life, and history, both sacred and profane, tells us of frequent similar cases in the past. Human nature has ever been the same, and but few women have been able to treat with justice and often not even with decency, their husband's children by another woman, and specially is that true when they have children of their own. Much has been said about Abraham's strength of character, and about his sense of justice, and of Sarah, his wife, it is written that her adornment consisted, not in the plaiting of her hair, the wearing of gold or the putting on of apparel, but in a meek and quiet spirit and subjection to her husband, yet when she bore a child she could no longer tolerate the presence of his half-brother, Ishmael, and declaring Ishmael should not be heir with her son, Isaac, she constrained Abraham, to his grief, to cast Ishmael out. Human nature has not changed, and we see repeated in this case what we have observed above.
Mrs.Gilliam was educated out of money which she had inherited through her mother, yet when she was being sent to school, Mrs. Guffy was angry with her husband because he did not send Clyde off to school at the same time. The father tried to explain that Mrs. Gilliam was being educated out of her own money, and that he was not then able to send Clyde to school, but this explanation seemed not to satisfy Mrs. Guffy. We see further evidence of this same feeling when it came time for the father to settle with his daughter as her guardian. *Page 810 
These things are not said to Mrs. Guffy's discredit. This is a weakness common to almost all women, a feeling and trait not universal, however, but which is only overcome by a few women of the super type. There are, perhaps, men who, under such circumstances, can resist, hold a level head and do even and exact justice, but Abraham could not, and such men are few. We can well understand how Squire Guffy, with his body and mind broken and enfeebled by age and disease, was constrained to execute this paper, unnatural in its terms and unjust in its provisions.
This verdict, instead of being flagrantly against the evidence, is amply supported and sustained by it.
Before closing this opinion, we wish to call attention to subsection 2 of rule V of this court which the appellants entirely overlooked in the briefing of this case, as a result of which our labors were greatly increased by having to search through the record to find of what they were complaining, and those items of the evidence mentioned in their brief.
The judgment is affirmed.