MURPHY, Guardian, Appellant, *v.* LA CHAPELLE, Respondent.

(No. 7,083.)

(Submitted June 27, 1933. Decided July 15, 1933.)

[24 Pac. (2d) 131.]

*Mr. C. A. Spaulding,* for Appellant, submitted a brief and argued the cause orally.

*Mr. Lester H. Loble* and *Mr. Hugh R. Adair,* for Respondent, submitted a brief; *Mr. Loble* argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

This action was brought by plaintiff as the guardian of Ulric A. La Chapelle to annul the marriage between Ulric A. and Florence Eyre La Chapelle upon the ground that at the time of the marriage Ulric A. La Chapelle was insane, feeble-minded and of unsound mind, and therefore incompetent to contract marriage. Upon issues framed by the complaint and answer, the cause was tried to the court without a jury. The court found the issues in favor of defendant and against plaintiff, and entered judgment accordingly. Plaintiff appealed from the judgment.

Among the questions presented by the appeal is that of whether the evidence is sufficient to support the findings and judgment. Before reviewing the evidence, we shall advert to the statutory provisions governing such an action, and to the rules of law which must guide us in pronouncing upon the correctness of the court's findings and judgment.

Section 5729, Revised Codes 1921, provides that "a marriage may be annulled for any of the following causes, existing at the time of the marriage: * * * 3. That either party was of unsound mind, unless such party, after coming to reason, freely cohabited with the other as husband or wife."

Plaintiff also relies upon section 5699, Id., which in part provides that marriages between persons "either of whom is feeble-minded, are incestuous and void from the beginning." He also relies upon section 7469, which provides that "all persons are capable of contracting, except minors, persons of unsound mind, and persons deprived of civil rights"; and upon section 5683, which in part provides that "a person entirely without understanding has no power to make a contract of any kind." So far as this case is concerned, we may assume, without so deciding, that plaintiff is entitled to rely upon these sections of the statute, in addition to section 5729.

Ordinarily, where the evidence is in conflict, we will not disturb the findings of the trial court, but, where the

evidence supporting its findings is trifling or unsubstantial, or where the decided preponderance of the evidence is against the findings, we will not hesitate to overturn them. (*Giebler* v. *Giebler*, 69 Mont. 347, 222 Pac. 436; *Shepherd & Pierson Co.* v. *Baker*, 81 Mont. 185, 262 Pac. 887; *Piersky* v. *Hocking*, 88 Mont. 358, 292 Pac. 725; *Bordeaux* v. *Bordeaux*, 32 Mont. 159, 80 Pac. 6.) If the evidence is substantially conflicting as to the mental competency of Ulric A. La Chapelle at the time of his marriage, the findings and judgment of the trial court must stand. (*Williams* v. *Williams*, 63 Cal. App. 482, 218 Pac. 783.)

The rule is well established by the authorities that, before a ▮ marriage contract may be annulled because of mental incompetency of one of the parties, there must be clear and convincing proof that such party was mentally incompetent at the time the marriage contract was entered into. (*Elfont* v. *Elfont*, 161 Md. 458, 157 Atl. 741, and cases therein cited.)

With this preliminary statement of the law applicable, we shall now proceed to discuss the evidence as presented by the parties.

The undisputed evidence shows that the marriage contract ▮ was entered into on the fourteenth day of August, 1930. Ulric A. La Chapelle was at that time living with his father on a ranch near Augusta in Lewis and Clark county. His mother was at that time in Montreal, Canada. His father was then, and had been for about ten years prior thereto, totally blind. Ulric was operating a cattle ranch for his father. The defendant is a niece of Mr. and Mrs. J. H. Carmichael, and since about eight years of age has made her home with them on a ranch near Augusta, with the exception of about three years during which time she lived with her husband under a prior marriage. Ulric and the defendant had known each other for many years before the marriage. The marriage was preceded by a courtship extending over a period of about two years. Ulric's father and mother are first cousins, and the father at one time was judicially declared to be mentally incompetent and committed to an asylum. He was subse-

quently released and apparently recovered from his disability. The mother had also been in a sanitarium for mental treatment. Ulric A. La Chapelle was on the ninth day of June, 1931, ordered confined in the insane asylum at Warm Springs, where he now is.

The plaintiff introduced evidence to the effect that a few days prior to the marriage Ulric was in a highly nervous condition; that he smoked cigarettes incessantly; that on more than one occasion he was seen at night walking about the farmyard in a naked condition, and on at least one occasion was seen in a naked condition jumping up and down on his bed; that two days before the marriage he loaded cattle for shipment from Reibling, Montana, to Chicago, Illinois, and at that time he exhibited abnormality in that he did not seem to appreciate that he had to sign the shipping contract, though he had often shipped cattle before and was shown to have known the necessity for signing the contract before the cattle would be moved; that, although it was the understanding that he should accompany the cattle train to Chicago, he did not do so, but followed on the passenger train two days later; and that, when loading the cattle, he was seen in the corral with the cattle on foot, which, some of the witnesses said, indicated to them he was not of sound mind.

Plaintiff's evidence tended to show that Ulric did not recognize some of his cattle a few days before the shipment, though the brands were visible. There was evidence that Ulric did not attend to the cattle after their arrival in Chicago; that Axel Swanson accompanied the shipment to Chicago, he having shipped some of his own cattle at the same time; that, though he and Ulric were well acquainted, Ulric passed him on the street in Chicago and did not recognize him; that, though Swanson informed Ulric that a cow had died en route to Chicago and requested him to present a claim therefor, Ulric did not evince sufficient interest in the cattle to do so, and requested Swanson to present the claim.

There was evidence that Ulric on occasions prior to the marriage had had hallucinations and fear about someone doing

him bodily harm, and that on many occasions he complained to his friends that he was afraid of a breach of promise action, though there appeared no basis for such fear.

In answer to a hypothetical question based upon the foregoing matters in evidence, eminent physicians testifying for plaintiff said in their opinion Ulric was mentally incompetent on August 14, 1930. They pronounced the ailment that of manic depressive psychosis, a progressive form of insanity. This was the ailment from which Ulric was suffering in June, 1931, when he was committed to Warm Springs. One physician who had examined Ulric gave his opinion that he was of unsound mind as early as June 15, 1930.

Defendant's evidence, briefly summarized was to the effect that at the time of the marriage, on August 14, 1930, which occurred in Great Falls in the presence of Ulric's father, Mr. and Mrs. Carmichael, the uncle and aunt of the defendant, and Mr. and Mrs. Chris Moren, Ulric did not do or say anything to indicate that he was in any way mentally unsound. Letters were introduced in evidence written by Ulric to defendant during the period of their courtship in 1928 and 1929, and one written on August 12, two days before the marriage. The letters themselves are what would be expected of a normal person under the same circumstances. There was evidence that on the day of the shipment of the cattle, August 12, Ulric had been drinking liquor and became "sick to his stomach" to the extent that he had to vomit.

Lay witnesses who had known Ulric for many years before the marriage, and who saw him shortly before and after the marriage, testified that there had been no apparent change in his mental condition while they knew him, and that in their opinion he was of sound mind before and after the marriage.

There was evidence also by two physicians that a person suffering from manic depressive psychosis may have lucid intervals lasting for an hour, a day, or four, five or six months, during which time he could function normally. This seems to be in line with what Singer & Krohn on Insanity and Law

have to say of this type of insanity, on pages 121 and 122 of their work.

Defendant, a graduate of the Dillon Normal School and the University of Montana, testified that she observed nothing wrong with Ulric mentally until a day or two before he was sent to Warm Springs, and then his statements indicated that he was extremely nervous over his mother's actions with reference to her property interests. It was developed that Ulric immediately after the marriage took his bride to Chicago. She said that while in Chicago she accompanied him to the stockyards twice. In Chicago Ulric ·telegraphed to his mother in Montreal, Canada, about his marriage. Receiving a telegraphic request from her to come to Montreal, he asked defendant to go with him there. Defendant thought it best for her not to go. There is some evidence in the record to indicate that defendant knew that Ulric's mother was opposed to the marriage for two reasons: First, because defendant had been divorced; second, because of difference in the religious faith of Ulric and defendant. Ulric finally deciding to go to Montreal, went as far as Niles, Michigan, from where he telephoned defendant to meet him and go with him to Montreal. She again thought it best not to do so, and Ulric returned to Chicago. Again he decided to go to his mother and started for Montreal a second time. This time he went as ·far as Detroit, Michigan, and again telephoned his wife to meet him there; she declining, he returned to Chicago and they came to Montana. Defendant expressed the opinion that Ulric was mentally sound at the time of the marriage.

From this evidence the learned trial judge held that Ulric was competent to enter into the contract of marriage on August 14, 1930. There is evidence strongly tending to show that at the time the marriage contract was entered into he had sufficient understanding to comprehend the nature of the contract and the responsibilities that flowed from it. We are not justified on the record before us in holding that the clear preponderance of the evidence is against the findings of the trial court.

Other assignments of error relate to the admission and ██ exclusion of evidence. It is contended that it was error to admit in evidence the letters written by Ulric to defendant in 1928 and 1929, as they had to do with a time other than that of the marriage. But evidence tending to show the mental condition of the husband before the marriage was admissible as bearing upon his condition at the time of the marriage. While some of the letters were remote in point of time, that went to their weight and not to their admissibility. It was not error to receive the letters in evidence.

The admission of other evidence is claimed to have been ██ erroneous. Were we, however, to concede that some evidence introduced was inadmissible, we would not be at liberty to overturn the findings and judgment, since they are amply supported by admissible evidence. Where a cause has been tried to the court without a jury, as was the present one, we will presume that any inadmissible testimony received in evidence was disregarded by the trial court. (*State* v. *Driscoll*, 49 Mont. 558, 144 Pac. 153; *Buhler* v. *Loftus*, 53 Mont. 546, 165 Pac. 601; *Minnesota Land & Trust Co.* v. *Busby*, 84 Mont. 373, 275 Pac. 761; *Williard* v. *Campbell*, 91 Mont. 493, 11 Pac. (2d) 782.)

Complaint is made that the trial court excluded evidence offered by plaintiff. The record discloses that a wide latitude was permitted in the reception of evidence. What was excluded was either wholly immaterial or was repetition of evidence given by the same witness. We see no cause for reversing the judgment on any ground.

The judgment is affirmed.

Mr. Chief Justice Callaway and Associate Justices Matthews and Anderson concur.

Mr. Justice Stewart, being disqualified, takes no part in the foregoing decision.