No. 19,315.

Bᴇʀɴɪᴄᴇ A. Yᴏᴜɴɢ, ᴇᴛᴄ. *v.* Cᴏʟᴏʀᴀᴅᴏ Nᴀᴛɪᴏɴᴀʟ Bᴀɴᴋ ᴏғ
Dᴇɴᴠᴇʀ, ᴀs Aᴅᴍɪɴɪsᴛʀᴀᴛᴏʀ ᴏғ ᴛʜᴇ Esᴛᴀᴛᴇ ᴏғ
Hᴏᴘᴇ W. Yᴏᴜɴɢ, Dᴇᴄᴇᴀsᴇᴅ.
(365 P. [2d] 701)

Decided October 2, 1961.

Mr. VINCENT CRISTIANO, Mr. ROBERT BUGDANOWITZ, and Mr. ROBERT T. KINGSLEY, for plaintiff in error.

Messrs. SHELDON and NORDMARK, for defendant in error.

*En Banc.*

MR. JUSTICE FRANTZ delivered the opinion of the Court.

An action to annul the marriage of the parties was founded on three counts. It was instituted by Hope W. Young through his conservator, the Colorado National Bank of Denver, against Bernice A. Young, also known as Bernice A. Ostling. A decree of annulment eventuated and became the subject of attack by writ of error in this court. While the case pended here, Mr. Young died. Substitution of party ensued.

To make our determination of the controversy more easily understandable, we will refer to the plaintiff as Mr. Young and to the defendant as Mrs. Young in the ensuing discussion of fact and law.

It was alleged in count one of the complaint that Mr. Young was eighty-six years of age, was adjudicated a mental incompetent on January 6, 1959, and that the Bank became his conservator; that the marriage license and certificate of marriage of the parties on July 23, 1958, were filed for record; and that Mr. Young was "mentally incompetent" to contract the marriage.

The allegations of the second and third counts were made upon information and belief. The substance of the second count is that no marriage ceremony was actually performed with the knowledge or participation of Mr. Young, and that, therefore, Mrs. Young was not his wife. The third count is based on the use of "guile, persuasion, undue influence or duress" to induce the marriage "as a jest, or dare or otherwise," and that Mr. Young did not intend to contract the marriage.

Admissions and denials and affirmative allegations were so framed in the answer of Mrs. Young that the issue of whether she was the lawful wife of Mr. Young was squarely put in contention.

Ten days after the answer was filed, Mr. Young requested "that the issues in the above captioned proceedings be tried to a jury." The case proceeded to trial. At the conclusion of Mr. Young's case in chief, argument developed over whether the jury was serving only in an advisory capacity. From the tenor of the discussion, it

would appear that at some prior stage of the proceedings the question had been raised, possibly examined, but not resolved. After the presentation of all the evidence, the trial court decided that the nature of the case permitted use of an advisory jury, and the proceedings thereafter progressed consistent with such view.

Sometime during the presentation of evidence in support of the defense, Mr. Young moved the court to permit him "to withdraw Plaintiff's Second Cause of Action from consideration in said case." His motion was granted. At the conclusion of all the evidence, the trial court granted Mrs. Young's motion to dismiss the third count of the complaint. The case thus was submitted to the jury on the sole question of the mental competency of Mr. Young to marry Mrs. Young.

Reversal of the "decree in annulment" is sought on three grounds: (1) alleged error in determining that the jury was an adviser rather than a finder of the facts; (2) alleged errors in the admission and exclusion of evidence in the course of the trial; and (3) alleged errors in the giving of certain instructions and in the refusal to give certain others tendered by Mrs. Young.

Reduced to its simplest terms, Mr. Young's reply to Mrs. Young's contentions concerning reversal is that the jury served in an advisory capacity only, and that errors, if any, regarding the reception or rejection of evidence and in the giving or refusing to give certain instructions, are harmless. Particularly is this true, it is urged, because the trial court ultimately determined the controversy, and in so doing, resorted to evidence out of the sum of disputed evidence sustaining the decree.

A trial of eighteen days' duration, in which thirty witnesses testified for Mr. Young, some on his case in chief and in rebuttal, and twenty-three testified for Mrs. Young, makes it difficult to narrate as a whole the facts in such manner as will bring them in proper perspective to the many errors alleged to have occurred in the trial of the case. It is deemed best to set forth the particular

facts as they relate to the particular legal problem posed by the error asserted.

Did the trial court properly determine that the jury would act in an advisory capacity? There are two problems wrapped up in this question. The first involves the nature of a suit for the annulment of a marriage. The second is created by the underlying circumstances leading to the submission of the case to the jury for advice.

Mr. Young contends that a suit for the annulment of a marriage is an equitable proceeding in which the jury can serve only in an advisory capacity. That the suit is statutory and hence triable by a jury in its traditional role is maintained with equal fervor by Mrs. Young.

Courts are not in accord concerning the nature of an action to annul a marriage. Differences spring from the historical beginnings of the action. Some courts hold that to seek an annulment is to invoke the equity powers of the court. Other courts have concluded that actions for annulment and divorce are sui generis and that neither at law nor in equity were the remedies available. A number of courts take jurisdiction without the authority of a statute where the basis for annulment is one upon which equity awards relief in respect of contracts generally, such as fraud, error, duress, mental incapacity, or want of consent.

Originally, authority to grant divorces and annul marriages in England was vested solely in the ecclesiastical courts. This authority terminated around 1870, during the reign of Victoria, at which time a special court was created to hear and decide all divorces and annulments of marriage. Ecclesiastical courts and their authority never became a part of American common law. See *D. v. D.*, 2 Terry, 41 Del. 263, 20 A. (2d) 139; *Eisenberg v. Eisenberg*, 105 Pa. Super. 142, 160 Atl. 229; *Urbach v. Urbach*, 52 Wyo. 207, 73 P. (2d) 953, 113 A.L.R. 889, for historical discussions of this phase of the law.

To fill the void legislatures of the several states enacted laws regarding divorce and annulment, and thus

created statutory rights and remedies in these areas. In these states divorce and annulment are deemed statutory actions. *Mitchell v. Mitchell,* 136 Me. 406, 11 A. (2d) 898; *Rumping v. Rumping,* 36 Mont. 39, 91 Pac. 1057, 12 L.R.A.N.S. 1197, 12 Ann. Cas. 1090. See *Githens v. Githens,* 78 Colo. 102, 239 Pac. 1023, 43 A.L.R. 547.

This court has spoken on the subject in the case of *Stebbins v. Anthony,* 5 Colo. 348. In considering the argument advanced, that since ecclesiastical courts and their authority never were a part of our law and chancery courts did not have jurisdiction to act in the premises, the latter courts must act upon statutory authority, the court said:

"This doctrine may be conceded only in cases where the grounds or causes alleged may be purely canonical. Our chancery courts would not be authorized to grant divorces for canonical defects or impediments, as impotency, for example, unless it was also made a ground of divorce by statute. But where the grounds for which a separation may be decreed are fixed by statute, as in the present instance, the litigation is necessarily of equitable cognizance.

"The authority of the equity tribunals has also been recognized in cases of marriage void on grounds of *fraud, duress,* and *lunacy,* in the absence of statutory provisions by reason of the inherent jurisdiction of equity over these subjects."

Forty-five years later in *Githens v. Githens,* supra, without mentioning *Stebbins v. Anthony,* Justice Campbell stated:

"At common law, *as adopted by us,* courts of law and equity in England did not have jurisdiction in divorce cases. The ecclesiastical courts alone had such power." (Emphasis supplied.)

Justice Campbell further stated that "[n]o decree of divorce is maintainable except upon one or more of the statutory grounds." That statutes provide the dimensions for actions for divorce and annulment is more than

intimated further in *Johnson v. Johnson*, 22 Colo. 20, 43 Pac. 130, 55 Am. S.R. 112, and *Simmons v. Simmons*, 107 Colo. 78, 108 P. (2d) 871. "The marriage relation is so sacred in character that it is indissoluble except *in conformity with legislative requirements* and the solemn decree of a court. It cannot be annulled by contract, or at the pleasure of the parties." (Emphasis supplied.) *Popham v. Duncan*, 87 Colo. 149, 285 Pac. 757, 70 A.L.R. 824; *Otte v. Pierce*, 118 Colo. 123, 194 P. (2d) 331, 4 A.L.R. (2d) 536.

By virtue of C.R.S. '53, 135-1-1, the common law of England prior to 1607 was adopted so far as it is applicable and is of a general nature and has not been altered by legislation. To complicate the law, *Walton v. Walton*, 86 Colo. 1, 278 Pac. 780, enunciates the doctrine that an action for divorce is not a purely statutory proceeding, and that all courts, in entertaining divorce matters, do so under their equity powers.

Out of this rather confused and confusing state of the law we would bring clarity. Harmony of decision we believe will be achieved if we recognize that courts act "under their equity powers" in performing acts typical of courts vested with equity jurisdiction. Thus, the severance of marital ties, the rescission of the marriage contract (akin to rescission of contracts generally), the entry of custodial orders regarding children, the application of equitable principles in divorce and annulment actions, and so forth, are or have aspects of the conventional activities of a court of equity. Creating a statutory right and remedy in which these activities may be performed produces a statutory action in which the court is clothed with "equity powers."

Consonant with these views we hold that a suit for the annulment of a marriage is a statutory proceeding in which the court exercises equity powers, and that the statute on the subject controls our decision regarding the part a jury plays in the trial of the action.

The pertinent parts of the applicable statute are as follows:

"A marriage is voidable if one or more of the following conditions existed at the time of the marriage:

\* \* \*

"(7) One or both parties were mentally incapable of giving voluntary consent to the marriage." C.R.S. '53, 46-3-1, 1960 Perm. Cum. Supp.

"A voidable or void marriage is hereby declared, as public policy, to create a determinable marriage status. Any court having jurisdiction under this article may determine such status and may enter a decree annulling a voidable marriage or declaring a marriage to be void. \* \* \* " C.R.S. '53, 46-3-4, 1960 Perm. Cum. Supp.

"Suits for annulment or determination of marital status shall be actions in rem, affecting a specific status. The process, practice, and proceedings shall be in accordance with the rules of civil procedure for other civil actions, in rem, affecting a specific status." C.R.S. '53, 46-3-8, 1960 Perm. Cum. Supp.

■ When we advert to the rules of civil procedure relating to jury trials, as they become part of the annulment statute, we find that the right to such trial must be found in Rule 38 (a), which provides:

"Upon demand, in actions for the recovery of specific real or personal property, with or without damages, or for money claimed as due on contract, or as damages for breach of contract, or for injuries to person or property, an issue of fact *must be tried by a jury,* unless a jury trial is thereafter waived." (Emphasis supplied.)

A cursory reading of the rule makes obvious the conclusion that an annulment suit does not come within the meaning of any of the enumerated actions requiring trial by jury unless waived. A careful consideration of the rule merely confirms the result of the cursory reading. We therefore hold that, in the interplay of the annulment statute and the rules of civil procedure, there is

no trial by jury of an annulment suit as a matter of right.

Considering the following developments in the case, what should the trial court have done regarding the responsibility of the jury?

The party bringing suit to annul the marriage requested that the contest be waged before a jury in the manner one would request a jury trial as a matter of right. Both parties and the court proceeded on the theory that the case was triable by a jury in the traditional sense, and before the trial commenced a request for twelve jurors instead of six was made. Sometime after the request for a jury trial was made, plaintiff suggested that the case was in equity and permitted only an advisory verdict.

The case went to trial before a jury of twelve, and at the conclusion of plaintiff's case in chief motions to dismiss and withdraw counts two and three from the consideration of the jury were made by the defendant. The motions were then resisted by the plaintiff, in part on the ground that in an equity case the jury serves only in an advisory capacity. The trial court reserved ruling on the motions and the capacity of the jury and directed the parties to proceed with the trial. At the conclusion of all the evidence, the court again considered a motion to dismiss the third count and granted the motion. As noted above, the second count had already been voluntarily withdrawn.

This is the setting in which the court rendered its decision that the proceeding was in equity, so that the function of the jury was merely advisory.

The contention of Mr. Young that the trial court was dealing with an equity action, to which the court assented, is without foundation. Both argument and decision, that an advisory jury hear the case, were in this respect based upon an illusory premise. As already shown, the action is a statutory proceeding in which the court exercises equity powers. Being a statutory action,

Rule 39 (c), R.C.P. Colo., has an especial relevance to our problem in view of the circumstances preceding determination by the trial court to submit the case to the jury for an advisory verdict. Rule 39 (c) reads as follows:

"Advisory Jury and Trial by Consent. In all actions not triable by a jury the court upon motion or of its own initiative may try any issue with an *advisory* jury, or, except in actions against the state of Colorado when a statute provides for trial without a jury, the court, with the consent of both parties, may order a trial with a jury." (Emphasis supplied.)

■ It is to be observed that the headnote and the body of the rule refer to two kinds of trials. 1. Cases not triable by a jury may, on motion or on the court's own initiative, be tried with an "advisory jury." 2. Non-jury cases including non-jury statutory actions (with an exception not pertinent here) may, by consent of court and the parties, be tried with a "jury." In the first, an "advisory jury" acts; in the second, a "jury" acts. If it had been intended that the "trial by consent" be submitted to an "advisory jury," the rule would have so stated.

This rule takes care of two differing situations. In the first, a party may request that a non-jury case be tried to a jury and the adversary party may resist. In such case, the court may grant the request but, since it has been resisted, may use the services of the jury in an advisory capacity only. In the second, parties and court consenting, the jury's verdict has the effect of a common law verdict.

As we construe Rule 39 (c), the trial of a non-jury action to a jury, with the consent of both parties and the judge, is a jury trial in its regular sense.

■ Was there the necessary consent of court and parties to a jury trial in this case? We conclude that there was consent, arising from the circumstances related above. Once court and counsel embark upon a non-

jury statutory proceeding in such manner that it is treated as a jury case, the only way the status of the jury may be changed thereafter is by agreement.

██ Where the plaintiff demands a jury trial of a non-jury case and neither the defendant nor the court objects, consent to such trial is deemed to have been given, and the jury's verdict has "the same effect as if a jury trial had been a matter of right." *Kelly v. Shamrock Oil & Gas Corp.*, 171 F. (2d) 909, cert. den. 337 U.S. 917. The unilateral act of the trial court in changing the case from one of trial by consent to one in which an advisory verdict would be received was error; such change could only have been accomplished by agreement of the parties and the court.

But, it is argued, the case was submitted to an advisory jury, and the trial court followed its advisory finding; hence, Mrs. Young is without any ground of complaint. Such argument takes too much for granted. Effective jury action in this case depended upon whether certain rejected evidence offered by Mrs. Young should have been heard by the jury, whether certain evidence received over her objection should not have been heard by it, whether certain instructions given over her objection properly guided the jury, and whether other tendered but refused instructions should have been given in order to properly direct the jury.

One of the attorneys for Mr. Young forsook advocacy long enough to become a witness for the purpose of identifying three exhibits. These exhibits then formed the basis for comparison with Mr. Young's signatures on other instruments. The comparisons were made by handwriting experts, and the matter of identifying the exhibits and of making the comparisons are two facets of the case, the first of which we treat presently.

If identification was a part of the pith of the case so that it would be substantive, we would have a situation in which Mrs. Young's argument might be persuasive. Thus, if the ultimate issue were whether a forgery had

been perpetrated, identification would have been an important ingredient of the case. But testimony of an attorney in the trial that certain signatures are genuine, in order to lay the groundwork for experts to make comparisons relating to a single facet of the case, is formal proof in no way disentitling him from continuing in the case. Canons of Professional Ethics No. 19; *Aquilini v. Chamblin,* 94 Colo. 367, 30 P. (2d) 325. See *Burnett v. Taylor,* 36 Wyo. 12, 252 Pac. 790.

Having testified to formal matter, is the attorney subject to being called as a witness by the other side to be interrogated concerning his acts and conduct in dealing with Mr. Young, as Young's attorney and otherwise, shortly prior to, at the time of, and after the date of the marriage, where such interrogation would reveal by actions and by documents that the attorney treated Mr. Young as a mentally competent person? As part of this problem is the associated question of the assignment of the attorney's claim for fees against Mr. Young to his secretary, suit thereon, and the affidavit of mental competency in default proceedings in the case.

Neither the attorney nor his secretary are subject to examination in such manner when the case is in such posture. Since these activities were not performed in the progress of the present case, they do not come within the rule making conclusive upon the client the doings of his attorney in his behalf. *Warner v. Gunnison,* 2 Colo. App. 430, 31 Pac. 238. The relationship of attorney and client does not entitle the opposing party to call the attorney under Rule 43 (b), R.C.P. Colo., to propound leading questions to him as an adverse party or witness. *Bankers Trust Co. v. International Trust Co.,* 108 Colo. 15, 113 P. (2d) 656. Conduct of the attorney in extraneous matters, evincing an opinion on his part that his client is mentally competent, cannot, under the circumstances here present, be the subject of interrogation by calling the attorney as witness as tending to

prove the competency of his client in a suit between the latter and another.

Cases like *Hawkyard v. People,* 115 Colo. 35, 169 P. (2d) 178, and *Sabon v. People,* 142 Colo. 323, 350 P. (2d) 576, are distinguishable from this case. In the Hawkyard case the attorney for the alleged incompetent testified and informed the court as to his client's inability to properly manage his affairs. In the Sabon case the wife testified as to her husband's conduct, indicating his mental condition. In neither case were they testifying about *what they did* as indicative of their opinion of the alleged incompetent's mental condition.

The Report of the Medical Commission, the Order of Adjudication, both dated January 6, 1959, and the Reporter's Transcript of proceedings inducing the appointment of the Commission, were admitted in evidence over the objections of Mrs. Young. Was their admission error?

In the determination of these questions we must keep ever in mind that an inquiry into the mental capacity of a person is a statutory proceeding of a non-adversary nature. *Hawkyard v. People,* supra; *Sabon v. People,* supra; C.R.S. '53, 71-1-1, et seq., 1960 Perm. Cum. Supp.

By the statute a "mentally ill person" is defined as one "afflicted with disease, infirmity, old age, or disorder, which impairs his mental or emotional functions to a degree sufficient to require protection, supervision, treatment or confinement, for his own welfare or for the welfare or safety of others, or who by reason thereof, lacks sufficient control, judgment and discretion to manage his own property or affairs." C.R.S. '53, 71-1-1, 1960 Perm. Cum. Supp. Mr. Young was adjudged a "mentally ill person" five months and fourteen days after the marriage ceremony.

The report of the commission was inadmissible for three reasons. First, its admission as evidence is limited, by the statutory action authorizing it, to the jury trial provided for in C.R.S. '53, 71-1-13, 1960 Perm. Cum. Supp. "If the respondent requests a trial by jury, the

court shall, within one month, cause a jury of six persons to be summoned * * *. The findings of the medical commission shall be admissible as evidence upon the identification thereof by the person, or persons, verifying the report of the commission, and such person, or persons, shall be subject to examination and cross-examination * * *."

Its admission as evidence is permitted in the nonadversary statutory inquisition; it cannot be admitted in an adversary proceeding, such as the present case. Why? The answer forms the second reason why it should not have been admitted: it was a hearsay document. In speaking of a report of psychiatrists in a homicide case, this court, speaking through Justice Moore, said: "It cannot successfully be contended that the report itself would have been competent evidence. It would have been hearsay." *Carter v. People,* 119 Colo. 342, 204 P. (2d) 147.

Third, it being foreordained by the very nature of the principal issue in the case that testimony pro and con Mr. Young's mental capacity would be introduced, he could not throw the weight of Dr. Shere's views onto the scale by way of his findings with Dr. Hilton that Mr. Young was a "mentally ill person." The report added the voice of Dr. Shere (who did not appear as a witness) to others who testified that Mr. Young was mentally incompetent. Such practice was condemned in *Carter v. People,* supra. That Dr. Hilton testified on the day following the admission in evidence of the report accentuates rather than alleviates the gravity of the error, for it may have emphasized to the jury agreement between the two doctors regarding their finding, a result suggested in *Carter v. People* and disapproved as depending upon inadmissible evidence from which a prejudicial inference may have been drawn.

The order of adjudication was properly admitted. But since it was entered months after the marriage, and since the only question in the annulment pro-

ceeding was whether "[o]ne or both parties were mentally incapable of giving voluntary consent to the marriage," its effect was evidentiary only. *Martin v. Reid,* 106 Colo. 69, 101 P. (2d) 25. The element of time between the marriage and the adjudication, and the difference between "mentally ill persons" and persons "mentally incapable of giving voluntary consent to the marriage" create an evidential situation which, with other evidence in the case, should be considered and evaluated by the jury.

The Reporter's Transcript was a preliminary inquiry in which Mr. Young and his attorney appeared before County Judge Brofman. By its contents one learns that the hearing was exploratory and ex parte, to ascertain whether a medical commission should be appointed pursuant to C.R.S. '53, 71-1-1, 1960 Perm. Cum. Supp. None of the participants was subjected to cross-examination as witnesses in the instant case concerning what appears therein. It is a hearsay document, much like an ex parte affidavit, *In re Murphy's Estate,* 43 Mont. 353, 116 Pac. 1004, Ann. Cas. 1912 C 380, and under most circumstances inadmissible.

But, a reading of answers and statements made by Mr. Young at this hearing tend to expose his mental condition. For that purpose the exhibit was admissible. *Guffy v. Gilliam,* 213 Ky. 805, 281 S.W. 1024. We should remember "that conduct, conversations, and statements of persons of questionable sanity, had and made about the time in question, may be given to the jury as tests of mental capacity." *Thorne v. Cosand,* 160 Ind. 566, 67 N.E. 257. "A man's words show his mental condition. It is common to prove insanity by the party's sayings as well as by his acts. * * * A declaration which is sought as evidence of what the declarant thought or felt, or of his mental capacity, is of the best kind of evidence." *Mooney v. Olsen,* 22 Kan. 69.

In the reception of this evidence the trial court should, as was done in this case, indicate its limited pur-

pose to the jury. "In a case like this it is plain the witness is permitted to detail declarations which he has heard, *not as evidence of the truth of the fact asserted,* but of a spontaneous and unreflecting expression of the mental and emotional condition of the declarant." (Emphasis supplied.) *Piercy v. Piercy,* 18 Cal. App. 751, 124 Pac. 561. That the testimony is preserved by court record rather than narrated by a witness does not alter the rule of admissibility.

For these same reasons the deposition of Mr. Young, taken in a wholly unrelated case on June 25, 1956, was admissible. The circumstances of its taking and its contents were presented to the jury through the certified shorthand reporter who had been employed at the time to serve in the matter. Again, the trial court should have been careful to indicate the limited purpose for which this testimony was being received.

Objection was made to the admission of the blood test certificate, required by C.R.S. '53, 90-1-6 (5), to be filed before a license may issue. The several grounds of objection were overruled.

A form of certificate is prepared and supplied by the state and at the bottom it provides, "This is to certify, that I am the applicant referred to in the above certificate," followed by a space for a signature. It was sought to prove that the signature of Mr. Young, appearing on the certificate, was a forgery.

That a failure to obtain the blood test does not invalidate a marriage, since the statute provides for penalties only in the event of violation; that the blood test of Mr. Young was actually and undeniably made; that the statute does not provide for certification by the applicant and his signature; and that a forged signature to such a document, if proved, is an immaterial fact to establish mental illness, or that no marriage ceremony took place, or that "guile, persuasion, undue influence or duress" were used to induce the marriage "as a jest or

dare or otherwise," were the various reasons assigned for inadmissibility.

By virtue of the composition of the statute and the issues being tried, we hold that the evidence of forgery was immaterial and should not have been received. Forgery would not remotely prove the allegations of any of the three bases for annulment, and violation of the statute does not per se afford grounds for annulment, even if such had been pleaded. See *Portwood v. Portwood* (Tex. Civ. App.), 109 S.W. (2d) 515.

Ester D. Collins and her husband witnessed the marriage between Mr. and Mrs. Young. Mrs. Collins was a witness in the trial of this case — in fact, she was the only disinterested eyewitness to the ceremony to testify. She was introduced to the parties by the Justice of the Peace who performed the ceremony. Her credibility was impaired in the course of the trial. On cross-examination by Mrs. Young's attorneys she was asked questions concerning Mr. Young's mental condition at the time of the marriage, against which objections were made. It would appear from the record that the trial court sustained the objections chiefly on the basis that her testimony had revealed an unreliable memory. An offer of proof was made, the substance of which showed that Mrs. Collins had observed Mr. Young before, during, and after the ceremony; that she had conversations with him; and that in her opinion he was mentally competent. The offer of proof was rejected. Her testimony should have been received. Whether it was credible under the circumstances was a problem for the jury to resolve. The question of the credibility of a witness testifying in relation to mental capacity "was for the exclusive consideration and determination of the jury. * * * " *Davis v. Davis*, 64 Colo. 62, 170 Pac. 208.

Length of time in observing and conversing with the alleged incompetent affects the weight to be given to the testimony; that observation and conversation may not have been protracted does not render the testimony

inadmissible. *Hopkins v. Wampler,* 108 Va. 705, 62 S.E. 926; *Obold v. Obold,* 163 F. (2d) 32; *Rutledge v. Rutledge,* 5 Ill. App. (2d) 355, 125 N.E. (2d) 355; see *Leick v. People,* 136 Colo. 535, 322 P. (2d) 674.

 A psychiatrist testified in behalf of Mr. Young. At the conclusion of his testimony, Mrs. Young moved that it be stricken. The motion was denied. ᴵDid the trial court properly deny the motion when it was made to appear that the doctor based his opinion of incompetency not alone upon his examination of Mr. Young, nor upon all the evidence (indeed, the evidence was in dispute), but upon the testimony of another witness for the plaintiff?

*O'Brien v. Wallace,* 137 Colo. 253, 324 P. (2d) 1028, sets forth doctrine that makes apodictic the impropriety of the trial court's ruling. According to this authority the doctor's conclusion, based upon his examination and the testimony of one of a number of witnesses, constituted an invasion of that which was the function of the jury — passing upon the credit and weight of testimony of witnesses. An expert witness may not select evidence he deems credible in order to express an opinion. See *Johnson v. Industrial Commission,* 137 Colo. 591, 328 P. (2d) 384.

On August 5, 1958 (13 days after the alleged marriage), Mrs. Young applied for a driver's license and signed the application "Bernice A. Blackburn," one of her former names. On December 2, 1958 (four months and nine days after the alleged wedding), she signed a delinquency tax statement as "Bernice Ostling," another former name. Both instruments, containing these revelations, were admitted in evidence during the cross-examination of Mrs. Young under Rule 43 (b) over objections that they were immaterial.

 At the time of their admission three separate grounds for annulment were undergoing exploration by the trial process. These two exhibits bore some rele-

vance on the question of the second ground — that no marriage ceremony took place. Their relation to the first and third grounds brought them within the interdictions as being remote circumstances, *D. & R. G. Ry. Co. v. Glasscott,* 4 Colo. 270, as having no legitimate bearing on such issues, *Beach v. Schroeder,* 47 Colo. 312, 107 Pac. 271, and as representing collateral matter, *Holy Cross Gold M. & M. Co. v. O'Sullivan,* 27 Colo. 237, 60 Pac. 570.

The later withdrawal of the second count by Mr. Young left this admitted evidence adrift. At the time of its admission the trial court had not limited its application to the second count, nor had there been a request that the court so restrict its consideration. Better practice dictates such limitation, and Mrs. Young should have suggested that the trial court so limit its admission. The trial court should have been given an opportunity to proceed in accordance with good practice. Hence, Mrs. Young now is in no position to complain. *Denver Tramway Co. v. Cowan,* 51 Colo. 64, 116 Pac. 136.

A series of checks were admitted in evidence after Mrs. Young's objections to them had been overruled. All but one were in payment of debts owing by Mr. Young. Mrs. Young had assisted in the preparation of the checks. One check in the sum of $26,000.00 was made payable to Mrs. Young as "Bernice Blackburn." This check was made a few days after the ceremony. The others were executed months thereafter. Testimony concerning these checks was elicited while Mrs. Young was being cross-examined under Rule 43 (b).

These exhibits were relevant to the second count. Those made to pay Mr. Young's debts in the circumstances had some relevance on the relationship of husband and wife. Her help in preparing them for her husband could be viewed as acts typically performed by a wife. The check payable to her as Bernice Blackburn permitted the opposite inference. In view of the with-

drawal of the second count, we advert again to *Denver Tramway Co. v. Cowan,* supra, as having application to these exhibits.

Mrs. Young called Dr. Palmer as a witness. The doctor testified that he had made the blood tests for Mr. and Mrs. Young, and that he had observed them sign the certificates. On cross-examination he was asked if a Miss Schaedel had not worked for him as a technician from January to April 1957. He answered in the negative. He was then asked if Schaedel had not obtained a judgment against him for wages in November 1958. He was further interrogated concerning an arrest on a charge of assault and battery brought by his wife in February 1958. Objections were timely made to these questions and overruled.

■ The fact that a civil judgment has been recovered against a witness does not tend to impeach his credibility. "We know of no authority for the proposition that a civil judgment rendered against a witness tends to impeach the credibility of the witness," *Karney v. Boyd,* 186 Wis. 594, 203 N.W. 371. It would follow that the matter out of which the judgment arose would be equally without impeaching quality.

Impeachment of a witness must be upon matter material to the trial. *King v. People,* 64 Colo. 398, 172 Pac. 8; *McKee v. People,* 69 Colo. 580, 195 Pac. 649; *Davis v. Bonebrake,* 135 Colo. 506, 313 P. (2d) 982. What is matter material to the trial? In the *McKee* and *Bonebrake* cases we held that the true test of materiality is: "Could the fact, as to which error is predicated, have been shown in evidence for any purpose independently of the contradiction?" Judged by this test, none of the several facts was admissible for impeachment purposes.

The jury was instructed that Mr. Young had the burden of proving his case by a "preponderance of the evidence." By another instruction the trial court advised the jury that the presumption of the validity of the mar-

riage must be "overthrown by clear and convincing evidence." By a later instruction the court charged the jury "that the preponderance or weight of evidence does not depend wholly upon the number of witnesses," and so forth; that in "determining upon which side the preponderance or weight of the evidence is, the jury should take into consideration," and so forth.

 Proof in an annulment case must be clear and convincing, and the court should have so instructed the jury. The preponderance rule was inapplicable. Marriages are not easily annulled and consequently "there must be clear and convincing proof that such party was mentally incompetent at the time the marriage contract was entered into." *Murphy v. La Chapell,* 95 Mont. 36, 24 P. (2d) 131. See *Elfont v. Elfont,* 161 Md. 458, 157 Atl. 741; *Thorne v. Farrar,* 57 Wash. 441, 107 Pac. 347, 135 Am. S.R. 995, 27 L.R.A.N.S. 385.

 Not only did the trial court resort to the wrong burden of proof, but in using the right burden to overcome the presumption of validity of the marriage, gave confusing and inconsistent instructions. We reaffirm that the giving of incompatible instructions on the burden of proof is fatal error. *Noel v. Jones,* 142 Colo. 318, 350 P. (2d) 815; *Sabon v. People,* supra.

The jury was further instructed "that Hope W. Young would be incapable of giving voluntary consent if you find that at the time of the marriage ceremony, he did not have sufficient mental capacity to understand the nature, obligations and responsibilities of a marriage contract and to appreciate the solemnity of the marriage vows." We believe that this goes beyond the statutory ground for annulment which provides that if "one or both parties were mentally incapable of giving voluntary consent to the marriage," the marriage may be set aside. See *De Nardo v. De Nardo,* 293 N.Y. 550, 59 N.E. (2d) 241.

Mrs. Young tendered instructions in effect informing

the jury that the burden was on Mr. Young to prove the allegations of his complaint by "clear, distinct, positive, and satisfactory" evidence. Our discussion of certain instructions which were given lays down the rule that clear and convincing evidence must be adduced if a party seeking an annulment would succeed.

An instruction tendered by Mrs. Young, and refused by the court, advised the jury of the limited purpose for which conversations and actions of Mr. Young were received in evidence. This instruction, or one of similar import, should have been given. Mr. Young's statements at the ex parte hearing preliminary to the appointment of the medical commission, and his deposition taken in a wholly unrelated case, would then have been put in proper perspective.

Because of the errors herein discussed, occurring in the trial of the case, the judgment must be reversed and a new trial ordered.

MR. JUSTICE DOYLE dissents.

MR. JUSTICE McWILLIAMS did not participate.