The MOUNTAIN STATES TELEPHONE AND TELEGRAPH COMPANY, a Colorado corporation, Kent J. Stauffer, Public Administrator for El Paso County, and Anne DiFede, Petitioners/Cross–Respondents,

v.

Susan DiFEDE,
Respondent/Cross–Petitioner.

No. 88SC266.

Supreme Court of Colorado,
En Banc.

Oct. 2, 1989.

Rehearing Denied Oct. 23, 1989.

---

Eiberger, Stacy, Smith & Martin, Raymond W. Martin and Paul F. Hodapp, and U.S. West Communications, Law Dept., Russell P. Rowe, Denver, for petitioner/cross-respondent Mountain States Tel. and Tel. Co.

Rector, Retherford, Mullen & Johnson, Anthony A. Johnson and Neil C. Bruce, Colorado Springs, for petitioner/cross-respondent Anne DiFede.

Kofoed & Larson, P.C., David L. Kofoed, Englewood, and Eugene F. Costello, P.C., Eugene F. Costello and Bernadette M. Bauman, Denver, for respondent/cross-petitioner Susan DiFede.

Justice VOLLACK delivered the Opinion of the Court.

In *Mountain States Telephone & Telegraph Co. v. DiFede*, 763 P.2d 298 (Colo.App.1988), the court of appeals reversed a judgment in favor of Mountain States Telephone and Telegraph Company (Mountain Bell or Anthony's employer) and John and Anne DiFede (the DiFedes or Anthony's parents). It held that the trial court erred both in entering a judgment notwithstanding the verdict in favor of Mountain Bell and the parents of Anthony DiFede (Anthony) and in treating the jury verdict in favor of Susan DiFede (Susan) as merely advisory. It also held that the trial court erred in prohibiting Mountain Bell and Anthony's parents from questioning Susan about the conversation she had with an attorney, concluding that a client may not invoke the attorney-client privilege to avoid testifying about conversations the client had with the attorney. We reverse the judgment of the court of appeals and remand the case to the court of appeals with instructions to reinstate the trial

court's judgment in favor of Mountain Bell and the DiFedes.

## I.

The procedural, strategic, and substantive issues involved in this case involve a great amount of factual detail. For clarity, we will divide the facts into various subheadings.

## A. EVENTS BEFORE ANTHONY'S DEATH

Susan and Anthony were married on December 28, 1976. In early 1979, Anthony learned he had terminal cancer. In April 1979, they decided to divorce.[1] On June 28, 1979, Anthony filed a petition for dissolution of marriage in El Paso County District Court. Susan was served the next day. She and Anthony agreed to meet at Anthony's attorney's office on July 2 to sign a separation agreement.

On July 2, 1979, Susan met privately with Raymond Wilder, Anthony's attorney, before Anthony arrived, to discuss the effect of a separation agreement he had prepared for her to sign and to communicate her concern that Anthony was no longer acting in a rational capacity. What was said during that conversation is the essence of this dispute.

When Anthony arrived at Wilder's office, he and Susan signed the separation agreement. Among other things, the separation agreement permitted Anthony to change the beneficiary of the life insurance policy provided by his employer, Mountain Bell;[2] prohibited Susan from claiming an interest in certain real estate acquired by Anthony before his marriage;[3] and prohibited Susan from claiming a right of inheritance.[4] Anthony's previous will was torn up at that meeting. Susan at that time quitclaimed any interest she had in the real property to Anthony and received a $5,000 lump-sum spousal support and maintenance settlement from Anthony under the terms of the separation agreement.

Ten days after signing the separation agreement, Susan met with Jack Foutch, a Colorado Springs attorney, to discuss the separation agreement. What was said during that conversation is also relevant to this dispute.

On August 14, 1979, Anthony executed a new will incorporating the separation agreement and naming his parents as legatees and devisees. He also made his parents the beneficiaries of the life insurance policy provided by Mountain Bell. On August 16, 1979, Anthony conveyed the real estate to his parents. Anthony died on August 23, 1979, however, before the sepa-

---

1. According to Susan, the decision to divorce was not mutual. She testified that Anthony wanted to divorce not because he no longer loved her but because his treating physician advised Anthony to disassociate himself from her to avoid the spread of cancer in his own body due to the emotional turmoil of his marriage and because Anthony's will had been overcome by the radical cancer treatment he was receiving and the efforts of Anthony's parents to portray Susan as the source of his problems. She also testified that she never wanted to divorce Anthony but merely acquiesced to his demands to make his final days of life less intolerable.

2. This conclusion is based on the following language in Paragraph 3 of the separation agreement:

   Any and all insurance policies held by and owned by either [Anthony] or [Susan], shall be and remain their separate property with the right to change beneficiaries as they so desire.

3. This conclusion is based on the following language in Paragraph 1 of the separation agreement:

   The parties agree that all of said real property, together with all improvements and appurtenances shall be and remain the sole property of [Anthony], and [Susan] shall have no further right, title, interest, claim or demand therein or thereto.

4. This conclusion is based on the following language in Paragraph 11 of the separation agreement:

   The Parties hereto do hereby, for herself and himself, her or his heirs, personal representatives and assigns, waive and release all rights of inheritance, either statutory or otherwise, in and to the property and estate of the other party, including widow's allowance and any and all statutory allowances, and each party does hereby especially waive and release all claims and demands of whatever kind and nature owned by the party hereto at the time of the death of such opposite party.

ration agreement could be submitted for the approval of a court, and before a decree of dissolution could be entered.

## B. PROCEDURAL EVOLUTION OF THE THREE CASES

On September 14, 1979, Susan filed a complaint in El Paso County District Court (No. 79CV1840, the real-property-transfer case or property case) against the DiFedes to set aside the August 16 transfers of real property on the grounds of undue influence on the part of the DiFedes and incapacity on the part of Anthony. Neither Susan, in her complaint, nor the DiFedes, in their answer, requested a jury trial in the real-property-transfer case.

On September 17, 1979, Susan filed a complaint for declaratory judgment in El Paso County District Court (No. 79CV1858, the change-of-beneficiary case or beneficiary case) against Mountain Bell and the DiFedes to set aside Anthony's change of life-insurance beneficiary on the grounds of undue influence and incapacity. Neither Susan, in her complaint, nor Mountain Bell and the DiFedes, in their answers, demanded a jury trial in the change-of-beneficiary case.

On November 30, 1979, Susan filed a petition for adjudication of intestacy and for her appointment as personal representative of Anthony's estate in El Paso County District Court (No. 79PR0582, the probate case). She asked that the will be probated informally. On January 9, 1980, the court denied Susan's request to have the will probated informally and appointed Raymond Wilder personal representative of Anthony's estate according to the terms of Anthony's will. On February 13, 1980, Wilder filed a petition for formal probate of the will. Susan objected to the petition for formal probate on March 4, 1980. She alleged that Anthony lacked capacity to execute a will and that the DiFedes exerted undue influence on Anthony to designate them as his devisees and legatees. She demanded a jury trial of six and paid a $25.00 jury fee in the probate case.

### 1. Consolidation of Property Case and Beneficiary Case

On May 21, 1980, the trial court granted Mountain Bell's request to consolidate the property case and the beneficiary case. On December 5, 1980, the trial court set the consolidated cases for a two-and-a-half-day jury trial to begin August 11, 1981, even though no party had requested a jury trial for those cases.

### 2. Bifurcation of Issues

On July 3, 1980, the DiFedes moved for summary judgment in the property case on the ground that Susan's claim was barred by the separation agreement. Mountain Bell joined in this motion in the beneficiary case on August 5, 1980. On November 15, 1980, the trial court granted partial summary judgment in favor of the DiFedes and Mountain Bell, holding that the separation agreement was enforceable subject to Susan's claim of fraud, concealment, failure to disclose assets, and misrepresentation.

On December 19, 1980, two weeks after the trial court *sua sponte* set the cases for jury trial, the DiFedes moved to bifurcate the property case and the beneficiary case so as to litigate first the issue of enforceability of the separation agreement. In their motion to bifurcate, the DiFedes requested that the issue of enforceability of the separation agreement be tried to the court rather than to a jury because rescission of the separation agreement, the remedy sought by Susan, was an equitable action not entitled to a jury trial. A hearing on the motion to bifurcate was held on March 16, 1981. The issue of consent to a jury trial in the two consolidated cases arose only in the following exchange between the court and the attorney for the DiFedes:

> MR. JOHNSON [representing the DiFedes]: I have also asserted that the trial should be one to the Court, and that may be premature, Your Honor, because I think if the Court orders that this be bifurcated, I think I am entitled to a pleading from the other side telling why they think the settlement agreement should be set aside, and there is no pleading in the file, and I don't—I wouldn't want the Court to rule on whether they

are entitled to a jury trial without having that pleading to look at, because as the Court is aware, the case law says that the pleading is what determines whether there is a right to a jury trial or not, whether it is a case in equity or not.

. . . .

THE COURT: ... [I]f the Plaintiff wants to attack this agreement on fraud, concealment, failure to disclose, that sounds like a jury question, Mr. Johnson.

. . . .

MR. JOHNSON: It may very well be, and that's why I said the question of jury should be put off until we had a pleading to which to respond with respect to the settlement agreement.

Following the hearing, the trial court granted the motion to bifurcate. It declined to decide the jury-trial issue, however, until Susan made clear through responsive pleadings the basis of her attack on the validity of the separation agreement.

### 3. Pretrial Statements

Pretrial statements of Susan, the DiFedes, and Mountain Bell filed in May 1981

5. The jury-trial issue did not arise directly at pretrial conference. The DiFedes' attorney indirectly acknowledged the possibility of a jury trial, however, by stating that depositions he had taken of witnesses he had not anticipated calling had not been summarized and organized "in a manner easily understandable to a jury." Also, Susan's attorney said that Anthony's statements could be admitted to show his state of mind but not his capacity and that was why Susan's evidence of Anthony's statements would "have to have a limited [sic] instruction at the time of the jury."

6. Prior to selecting the jury, the following conversation related to advisory juries occurred:
THE COURT: ... Is the setting aside of the separation agreement on these various grounds equitable in nature?
MR. KOFOED [representing Susan]: I think it is to a degree, Your Honor. There are questions of fact involved, I think, which would be jury-oriented.
And as far as the setting aside, it's our position that they have set this up as an affirmative defense, and we are seeking to avoid it. I think they are, in essence, saying that we have breached the contract by asserting the separation agreement. We're saying that we are avoiding the contract.

indicated that trial was to be held before a jury. Statements made by attorneys for the DiFedes and Susan at the pretrial conference on August 5, 1981, indicated that a jury would be impaneled.[5] The pretrial order entered August 11, 1981, the day trial was scheduled to begin, also stated that trial was to be held before a jury.

### 4. Consolidation of Probate Case With Consolidated Cases

On May 12, 1981, the DiFedes filed a motion to consolidate the probate case with the two previously consolidated cases. The trial court granted the DiFedes' motion to consolidate on August 11, 1981, the day the trial on the property case and the beneficiary case was scheduled to begin. The trial court at that time delayed deciding whether the six-person jury was an advisory or binding jury until the close of evidence.[6]

### C. THEORY OF THE CASE

Although the three cases nominally concern transfers of real property and change

THE COURT: Well, of course, you elected to proceed in this manner. You were not mentioning anything about the separation agreement, you just filed a direct action against the grantees, actually, under the deeds that arose because of the separation agreement. And whether you can control it to that extent on what is done and not done, there is a question. That's what I'm concerned about.

. . . .

THE COURT: I think we discussed that [the possibility of an advisory jury] at the first pretrial.
MR. JOHNSON [representing the DiFedes]: We discussed it in the context of a motion I made to strike a jury in the case, Your Honor, and the Court felt that since this action was appended to a claim at law, that a jury would be in order.
I'm taking the position that this is an advisory jury because the relief sought is the rescission of the contract, and that is a remedy in equity, and that, therefore, this is an advisory jury.
THE COURT: It sounds in the nature of an advisory jury in the action to set aside the separation agreement, which admittedly was signed, but I'm not going to cross that bridge at this time. I want to go ahead and we can impanel, get the jury selected and get into the evidence.

of beneficiary on August 16, 1979, and dispositions under a will signed on August 14, 1979, the real dispute for our purposes centers on the validity of the separation agreement Susan and Anthony signed on July 2, 1979. The defendants in all three cases defended their actions on the basis of the separation agreement. The trial concerned only the validity of the separation agreement, and the only issue submitted to the jury was whether Susan was induced to sign the separation agreement through fraud.

Susan based her fraud-in-the-inducement theory on her contention that Anthony's attorney, Raymond Wilder, had told her on July 2 that the separation agreement would not be binding until it was approved by the court and that the agreement by law could not be approved by the court for at least ninety days. Because she believed Anthony would not live for an additional ninety days, she believed that the separation agreement could never be enforceable. She claims she would not have signed the separation agreement had she not relied on Wilder's statement that the separation agreement was not enforceable until approved by a court. Based on this allegedly fraudulent inducement, she sought to rescind the separation agreement and subsequently avoid the August 16 transfers of real property, the August 16 change of beneficiary of insurance and employment benefits, and dispositions under the August 14 will.

Mountain Bell and the DiFedes had three responses to Susan's fraud-in-the-inducement theory. First, they claimed that Raymond Wilder never told her the separation agreement was not immediately enforceable. Second, they claimed that Susan signed the agreement not because of any false statement by Raymond Wilder but because of her contention that Anthony and his parents forced her to sign the separation agreement through emotional blackmail amounting to duress. Third, they claimed that Susan did not reasonably rely on any false statement by Raymond Wilder because she met with attorney Jack Foutch ten days after she signed the separation

agreement and because Foutch must have told her that the separation agreement was enforceable prior to approval by the court. As a corollary to the third argument, Mountain Bell and the DiFedes contended that if Foutch told Susan on July 13 that the separation agreement was enforceable, then Susan's claim of fraud-in-the-inducement would be barred by the doctrine of laches for failure to bring the fraudulent-inducement claim to the attention of all parties as soon as the fraud is discovered. *See, e.g., Ponder v. Altura Farms Co.,* 57 Colo. 519, 525–26, 143 P. 570, 572 (1914) (party seeking to rescind contract on ground of fraudulent inducement "must, upon the discovery of the facts, at once announce his purpose" or else will be deemed to have waived the objection and be bound by the contract). Because of the invalidity of Susan's fraudulent-inducement theory, Mountain Bell and the DiFedes contended the separation agreement was enforceable and as a result the transfers of real property, change of beneficiary and dispositions under the will were valid.

### D. TRIAL

Mountain Bell and the DiFedes attempted to cross-examine Susan about the conversation she had with Jack Foutch ten days after meeting with Raymond Wilder. The trial court sustained objections to those questions on the ground that those communications were protected by the attorney-client privilege.

At the close of Susan's case, the trial court directed verdicts against her on all issues except the issue of fraudulent inducement. The jury eventually returned a special verdict for Susan indicating that she had been induced to sign the separation agreement through fraud. The trial court dismissed the jury without stating whether the jury verdict was binding or advisory.

### E. POST–TRIAL PROCEEDINGS

On September 1, 1981, Mountain Bell and the DiFedes filed motions for judgment

notwithstanding the verdict on a number of grounds, including failure of the trial court to permit them to cross-examine Susan about her conversation with attorney Foutch on July 13 and that the jury verdict was merely advisory.

On December 24, 1981, following a hearing, the trial court entered judgment notwithstanding the verdict in favor of Mountain Bell and the DiFedes. The trial court found three bases, any one of which would support a motion for judgment notwithstanding the verdict. The first basis for granting judgment notwithstanding the verdict was that the dead man's statute prohibited Susan from testifying about conversations she had with Anthony's attorney. The second basis was that Susan should not have been permitted to submit the issue of fraud-in-the-inducement to the jury because she failed to introduce sufficient evidence that she relied on the allegedly fraudulent misrepresentation. The third basis was that Susan should not have been allowed to use the attorney-client privilege to avoid testifying about whether she was aware that the separation agreement was enforceable before Anthony died.

The trial court also held that the jury verdict in favor of Susan was merely advisory rather than binding on the court. It stated:

> The question of whether the jury was acting in an advisory capacity has been presented in the briefs. None of the parties requested a jury nor did they pay a jury fee. As the Court recalls and over the objection of Defendants, a jury was called on the motion of the Court to answer the question of whether Plaintiff executed the Agreement as a result of fraud or other grounds that were alleged. An action to rescind an otherwise valid agreement is an equitable proceeding and a jury, insofar as the parties are concerned, would not be a matter of right. In the opinion of the Court, such a jury would only serve in an advisory capacity.

Susan appealed to the court of appeals.

## F. JUDGMENT OF THE COURT OF APPEALS

The court of appeals reversed the judgment of the district court. It held that the first two bases of the district court for granting judgment notwithstanding the verdict were erroneous. As for the trial court's third basis for granting judgment notwithstanding the verdict, the court of appeals held that the trial court properly concluded that "the attorney-client privilege should not have been a bar to [Susan's] testimony concerning consultations she had with other counsel, since the applicable statute precludes only the attorney testifying without the consent of his client." *DiFede*, 763 P.2d at 300 (citation omitted). The court of appeals concluded, however, that the trial court should have granted a new trial rather than substituting its finding for that of the jury by entering judgment notwithstanding the verdict. *Id.*

The court of appeals also held that the trial court erred in concluding that the jury verdict was merely advisory. Based on *Young v. Colorado National Bank*, 148 Colo. 104, 365 P.2d 701 (1961), the court of appeals concluded that the verdict of the jury was binding on the trial court even though the issue was an equitable one because both parties consented to a jury trial by failing to object to jury-trial demands in their pretrial statements. *DiFede*, 763 P.2d at 300. The court of appeals therefore reversed the judgment of the trial court and remanded the case for a new trial.

## G. ISSUES ON REVIEW

Mountain Bell, the DiFedes, and Susan sought certiorari review with this court. In their petition for writ of certiorari, Mountain Bell and the DiFedes argued that the court of appeals erred in concluding that the jury verdict was binding on the trial court. In her cross-petition for writ of certiorari, Susan argued that the court of appeals erred in concluding that statements made by the client are not protected by the attorney-client privilege. We granted certiorari on both the advisory-jury issue and

the attorney-client-privilege issue.[7]

## II.

█ Trial by jury in civil actions is not a matter of right in Colorado. *Johnson v. Neel*, 123 Colo. 377, 387, 229 P.2d 939, 944 (1951). In actions for the recovery of specific real or personal property, breach of contract, and injuries to persons or property, a party upon demand must receive a trial by jury. C.R.C.P. 38. In all actions not triable by a jury under C.R.C.P. 38, C.R.C.P. 39(c) permits a jury to act in an advisory capacity upon motion or of the trial court's own initiative. C.R.C.P. 39(c) also permits the court to order a trial to a binding jury with the consent of both parties. In *Young v. Colorado National Bank*, 148 Colo. 104, 114, 365 P.2d 701, 708 (1961), we stated:

> This rule takes care of two differing situations. In the first, a party may request that a non-jury case be tried to a jury and the adversary party may resist. In such case, the court may grant the request but, since it has been resisted, may use the services of the jury in an advisory capacity only. In the second, parties and court consenting, the jury's verdict has the effect of a common law verdict.

█ We also stated in *Young* the test for determining when both parties consent to a binding jury trial under C.R.C.P. 39(c): "Where the plaintiff demands a jury trial of a non-jury case and neither the defendant nor the court objects, consent to such trial is deemed to have been given, and the jury's verdict has 'the same effect as if a jury trial had been a matter of right.'" *Id.* at 115, 365 P.2d at 708 (quoting *Kelly v. Shamrock Oil & Gas Corp.*, 171 F.2d 909, 911 (5th Cir.1948) (on motion for rehearing), *cert. denied*, 337 U.S. 917, 69 S.Ct. 1159, 93 L.Ed. 1727 (1949)). The question in this case is whether Mountain Bell and the DiFedes consented to a binding jury by failing to object.

Mountain Bell and the DiFedes argue that the court of appeals erred in concluding that they consented to a binding jury. They claim they objected to a binding jury trial at the motion to bifurcate and prior to impaneling the jury, and that the trial court's recollection in entering judgment notwithstanding the verdict was accurate that the jury was impaneled over their objection. They argue that the degree of consent present in *Young* was lacking in this case.

Susan argues that the court of appeals properly concluded, based on *Young*, that Mountain Bell and the DiFedes consented to a binding jury trial. She claims that the DiFedes did not object to the imposition of a jury trial either when the DiFedes moved to consolidate the probate case with the other two consolidated cases or at the pretrial conference.

The court of appeals concluded that the jury verdict was binding rather than advisory because Mountain Bell and the DiFedes consented to a binding jury by failing to object before trial. We conclude from their conduct that Mountain Bell and the DiFedes objected before trial to imposition of a binding jury.

### A.

In *Young*, the conservator of an eighty-six-year-old man (Young) sought to annul his marriage on the ground of mental incompetency. Although no demand for a jury trial was made in the complaint, Young requested a jury trial ten days after the answer was filed. The parties prepared for trial without objection. At some stage prior to the close of Young's case-in-chief the question of whether the jury would be merely advisory was raised and possibly examined, but the issue was not resolved. At the close of Young's case-in-chief the dispute again arose. After the presentation of all the evidence, the trial court decided that the equitable nature of the case permitted use of an advisory jury,

---

**7.** We denied certiorari on the issues of whether the dead man's statute prohibited Susan from testifying about the conversation she had with Raymond Wilder concerning the separation agreement and whether there was sufficient evidence of reliance on Raymond Wilder's statement to submit the issue of fraudulent inducement to the jury.

and made its own findings of fact in favor of Young.

This court reversed the judgment of the trial court. We concluded that the parties had consented to a binding jury on the equitable issue because "neither the defendant nor the court object[ed]" after the plaintiff demanded a jury trial. 148 Colo. at 115, 365 P.2d at 708.

### B.

Three factors lead us to conclude that Mountain Bell and the DiFedes did not consent to a binding jury trial by failing to object. First, Mountain Bell and the DiFedes made specific pretrial objections to the imposition of a binding jury trial both in the motion to bifurcate in the property case and the beneficiary case and prior to impaneling the jury. Second, the trial court expressed reservations at the hearing on the motion to bifurcate and prior to trial about impaneling a binding jury. Third, the tangled procedural history of these cases did not make clear that failure to object at each pretrial proceeding would be treated as consent to a binding jury. The first time Mountain Bell and the DiFedes were confronted with a request by Susan for a jury trial was on August 11, 1981, the day the motion to consolidate the probate case with the other two cases was granted and trial began. By that time, Mountain Bell and the DiFedes had already objected to imposition· of a binding jury trial. Unlike the defendant and court in *Young*, Mountain Bell, the DiFedes, and the trial court did more than merely raise and possibly examine the issue of an advisory jury. Although the proceedings are not a model of clarity, we conclude that the defendants objected within the meaning of *Young* to impaneling a binding jury and that the trial court properly treated the jury verdict as merely advisory.

### III.

### A.

■ Susan argues that the court of appeals erred in concluding that she was not entitled to invoke the attorney-client privilege because the privilege precludes only the attorney from testifying. *DiFede*, 763 P.2d at 300. We conclude that the court of appeals misconstrued the scope of the attorney-client privilege.

The common-law attorney-client privilege has been codified in Colorado as section 13–90–107(1)(b), 6A C.R.S. (1987), which states:

> (1) There are particular relations in which it is the policy of the law to encourage confidence and to preserve it inviolate; therefore, a person shall not be examined as a witness in the following cases:
>
> . . . .
>
> (b) An attorney shall not be examined without the consent of his client as to any communication made by the client to him or his advice given thereon in the course of professional employment; nor shall an attorney's secretary, paralegal, legal assistant, stenographer, or clerk be examined without the consent of his employer concerning any fact, the knowledge of which he has acquired in such capacity.

Although section 13–90–107(1)(b) does not expressly state so, our case law is uniform that the attorney-client privilege is for the personal benefit and protection of the client. *See Losavio v. District Court*, 188 Colo. 127, 132–33, 533 P.2d 32, 35 (1975) ("As defined by the legislature and courts of this state, the attorney-client privilege is personal with the client."); *see also Law Offices of Bernard D. Morley v. MacFarlane*, 647 P.2d 1215, 1220 (Colo. 1982); *A v. District Court*, 191 Colo. 10, 20, 550. P.2d 315, 323 (1976), *cert. denied*, 429 U.S. 1040, 97 S.Ct. 737, 50 L.Ed.2d 751 (1977); *Mauro v. Tracy*, 152 Colo. 106, 109, 380 P.2d 570, 572 (1963); *Fearnley v. Fearnley*, 44 Colo. 417, 430, 98 P. 819, 824 (1908). The privilege "extends to confidential communications by or to the client in the course of gaining counsel, advice, or directions with respect to the client's rights or obligations." *Miller v. District Court*, 737 P.2d 834, 837 (Colo.1987) (footnote omitted) (citing *Losavio*, 188 Colo. at 133, 533 P.2d at 35; *Denver Tramway Co. v.*

*Owens,* 20 Colo. 107, 128, 36 P. 848, 855 (1894)). As Professor Wigmore described the evolution of the attorney-client privilege:

> Originally, ... the privilege did not protect the client himself from the usual methods of discovery in equity. As the 1700s drew to a close, it came first to be conceded that "the privilege was that of the client." By this time, a recognition began to be given to the logical consequence that he could not be interrogated as to communications made *for the purpose of the litigation at bar.* Yet the tradition was apparently still to the contrary. The case of *Preston v. Carr,* in 1826, was the last effort to preserve this tradition. It was thereafter immediately settled, by a series of nearly simultaneous rulings, that communications relative to the cause at bar, or even in contemplation of it, were protected from discovery from the client himself.

8 J. Wigmore, *Evidence* § 2294, at 561 (McNaughton rev. ed. 1961) (footnotes omitted) (emphasis in original). We therefore reject any intimation by the court of appeals that Susan, by virtue of her status as the client, may not invoke the protection of the attorney-client privilege. *See Nowell v. Superior Court,* 223 Cal.App.2d 652, 656, 36 Cal.Rptr. 21, 24 (1963) (attorney-client privilege embodied in California statute virtually identical to Colorado's "cannot be defeated by questioning the client instead of the attorney"); *Dunn v. Commonwealth,* 350 S.W.2d 709, 713 (Ky. 1961) (client cannot be cross-examined on a privileged communication under Kentucky statute similar to Colorado's because "the protection afforded by the statutory provision is for the client's exclusive benefit and if the privileged communication, which is precluded in the attorney's direct testimony, can be obtained indirectly by cross-examination of the client, then the privilege afforded by the statute would be worthless"); *Victor v. Fanning Starkey Co.,* 4 Wash.App. 920, 923, 486 P.2d 323, 324 (1971) (per curiam) (clients cannot be compelled to reveal contents of a letter to their attorney under Washington state statute similar to Colorado's because "the same privilege accorded to the attorney is also granted to the client" and therefore "the client may not be forced to divulge any communication from the attorney which is privileged").

**B.**

█ Mountain Bell and the DiFedes argue that Susan waived the attorney-client privilege with respect to her conversation with attorney Jack Foutch ten days after signing the separation agreement by placing directly at issue the question of her reasonable reliance on Raymond Wilder's alleged statement that the separation agreement would not be enforceable if Anthony died before the agreement was approved by the court. We agree that Susan waived her attorney-client privilege.

█ The attorney-client privilege is not an absolute privilege. *Law Offices,* 647 P.2d at 1220. A party, for example, may waive the protection of the privilege. This waiver is really a form of consent to disclosure. *Clark v. District Court,* 668 P.2d 3, 8 (Colo.1983). Waiver must be supported by evidence showing that the privilege holder, by words or conduct, has expressly or impliedly forsaken his claim of confidentiality with respect to the information in question. *Miller,* 737 P.2d at 838 (waiver of attorney-client privilege by retaining psychiatrist); *Clark,* 668 P.2d at 8 (waiver of physician-patient privilege); *Franco v. District Court,* 641 P.2d 922, 931 (Colo. 1982) (waiver of peer review privilege). The burden of proving waiver is on the party seeking to overcome the privilege. *Miller,* 737 P.2d at 838; *Clark,* 668 P.2d at 8.

The evidence presented by Mountain Bell and the DiFedes is sufficient to demonstrate an implied waiver by Susan of the attorney-client privilege.[8] The basis of Su-

---

**8.** It is possible that Susan waived the attorney-client privilege with respect to her conversations with Jack Foutch by answering questions on the subject in her deposition. All the parties agreed that Susan discussed her conversation with Jack Foutch in a deposition taken by the attorney for the DiFedes. The trial court based its finding that Susan waived her attorney-client

san's claim for rescission based on fraud-in-the-inducement was her contention that she relied on the incorrect legal statement of Raymond Wilder that the separation agreement was not enforceable at the time it was signed. That contention gave rise to the affirmative defense timely raised by Mountain Bell and the DiFedes that Susan's reliance on any incorrect statement by Wilder was not reasonable after she met with Jack Foutch.

Although we have not directly addressed this issue before, it is clear from our review of cases from other states that by placing in issue a confidential communication going directly to the claim or defense, a party impliedly waives the attorney-client privilege with respect to that communication. *See Lewis v. State*, 565 P.2d 846, 850 n. 4 (Alaska 1977) (client waives attorney-client privilege when he puts in issue the advice received from his attorney); *Chicago Title Ins. Co. v. Superior Court*, 174 Cal.App.3d 1142, 1149, 220 Cal.Rptr. 507, 512 (1985) (implied waiver of attorney-client privilege occurs "where the plaintiff has placed in issue a communication which goes to the heart of the claim in controversy"); *League v. Vanice*, 221 Neb. 34, 43, 374 N.W.2d 849, 856 (1985) (party who raises issue of his lack of knowledge of a corporate transaction in order to avoid a statute-of-limitations defense impliedly waives attorney-client privilege with respect to that issue); *United Jersey Bank v. Wolosoff*, 196 N.J.Super. 553, 562, 483 A.2d 821, 828 (1984) (when confidential communications are made a material issue in trial, fairness demands that the attorney-client privilege be waived); *Jakobleff v. Cerrato, Sweeney & Cohn*, 97 A.D.2d 834, 837, 468 N.Y.S.2d 895, 897 (1983) (mem.) (attorney-client privilege is waived "where the client places the subject matter of the privileged communication in issue" or "where invasion of the privilege is required to determine the validity of the client's claim or defense and appli-

cation of the privilege would deprive the adversary of vital information").

*League v. Vanice*, 221 Neb. 34, 374 N.W.2d 849 (1985), is particularly instructive to this case. In *League*, a minority shareholder (League) sued the corporation president (Vanice) for diverting corporate funds, authorizing excessive compensation to himself, and various acts amounting to breach of fiduciary duty to the shareholders. Vanice raised the affirmative defense that the applicable four-year statute of limitations had run. League countered that the statute of limitations did not begin to run until just before he filed the claims because Vanice concealed the transactions giving rise to the claims until that time. Vanice sought to compel League's former attorney to testify that he had advised League about the transactions in question more than four years before the claims were filed.

The trial court bifurcated the trial to litigate first the issue of the running of the statute of limitations. Over League's objection, his former attorney testified that he informed League more than four years before the claims were brought that the president had engaged in the transactions in question. Based on this testimony, the trial court held that League's claims were barred by the statute of limitations.

The Nebraska Supreme Court affirmed in part and reversed in part. It held that the trial court properly permitted Vanice to question League's former attorney about his conversations with League concerning Vanice's transactions for the corporation because League impliedly waived the attorney-client privilege by making his lack of knowledge a critical issue at trial. The court noted that implied waiver of a privilege is appropriate where the following factors are present:

(1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through

---

privilege in part on the contents of this deposition. No transcript of this deposition was made available to this court, however. If Susan did not invoke her attorney-client privilege in response to questions on the subject at this deposition, then her answers would be admissible as a

waiver of the privilege. We cannot make a determination of the defendants' claim of waiver based on Susan's answers in the deposition, however, in the absence of such a record on review.

this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense.

*League*, 221 Neb. at 44, 374 N.W.2d at 856 (quoting *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D.Wash.1975)). In concluding that League impliedly waived the attorney-client privilege, the court made the following observations:

> When he alleged concealment, League injected his knowledge, or lack of knowledge, into the litigation as a crucial issue relevant to disposition of the claims based on an alleged breach of fiduciary duty by Vanice as an officer of VPCI. League is not permitted to thrust his lack of knowledge into the litigation as a foundation or condition necessary to sustain his claim against Vanice while simultaneously retaining the lawyer-client privilege to frustrate proof of knowledge negating the very foundation or condition necessary to prevail on the claim asserted against Vanice. Such tactic or situation would repudiate the sword-shield maxim suggested in *Cerny v. Paxton & Gallagher Co.*, 83 Neb. 88, 92, 119 N.W. 14, 16 (1908), *overruled on other grounds*, *Caster v. Moeller*, 176 Neb. 446, 126 N.W.2d 485 (1964) ("Any other rule would enable the client to use as a sword the protection which is awarded him as a shield.").

*League*, 221 Neb. at 45, 374 N.W.2d at 856.

These observations are equally applicable to this case. When she alleged that she reasonably relied on Raymond Wilder's incorrect statement of the law, Susan injected her knowledge or lack of knowledge of the correct statement of the law as a crucial issue relevant to her claim of fraud-in-the-inducement. Only Jack Foutch and Susan know whether Jack Foutch disabused her of the incorrect notion that the separation agreement was not immediately enforceable. It would be unfair for Susan to thrust her lack of knowledge of the correct state of the law into the litigation by her claim of fraudulent inducement while simultaneously retaining the attorney-client privilege to frustrate attempts by Mountain Bell and the DiFedes to prove Susan's knowledge of the correct state of the law and thereby negate the very foundation necessary to prevail in Susan's claim of fraudulent inducement.

We conclude that Susan waived the attorney-client privilege with respect to her communications with Jack Foutch concerning whether he told her that the separation agreement was enforceable on July 2, 1979. For this reason, the trial court properly found in its judgment notwithstanding the verdict that it should have permitted Mountain Bell and the DiFedes to cross-examine Susan on this point at trial.

## IV.

Having concluded that the jury acted in a merely advisory capacity and that the trial court should have permitted Mountain Bell and the DiFedes to cross-examine Susan about whether Jack Foutch told her the separation agreement was binding, we must determine the correct disposition of the case. In entering judgment for Mountain Bell and the DiFedes, the trial court stated that "under all of the evidence presented, [Susan] did not sustain her burden of proof" in demonstrating fraudulent inducement in signing the separation agreement. Whether Susan's testimony was more believable than Raymond Wilder's testimony concerning their conversation of July 2, 1979, was the ultimate issue at trial. The trial court observed both their demeanors and concluded that Susan's version of the July 2 conversation was less believable than Raymond Wilder's.

We therefore reverse the judgment of the court of appeals and remand the case to the court of appeals with instructions to reinstate the trial court's judgment in favor of Mountain Bell and the DiFedes.

ERICKSON, J., specially concurs.

Justice ERICKSON specially concurring:

I join the majority's opinion insofar as it holds that respondent Susan DiFede (Su-

san) waived the attorney-client privilege with respect to her conversation with attorney Jack Foutch. In addition, I agree that the jury's verdict was advisory only, and not binding on the court. However, because I would decide the jury issue on narrower grounds than the majority does, I concur separately.

First, I conclude that *Young v. Colorado National Bank*, 148 Colo. 104, 365 P.2d 701 (1961), has no application to either the real property transfer case (No. 79CV1840), or the change-of-beneficiary case (No. 79CV1848). In neither case was there a jury demand by any party. I read *Young* as requiring such a demand before the parties and the court can be deemed to be bound by consent to the verdict of a jury in an equitable case:

> Where the plaintiff demands a jury trial of a non-jury case and neither the defendant nor the court objects, consent to such trial is deemed to have been given, and the jury's verdict has "the same effect as if a jury trial had been a matter of right."

*Young*, 148 Colo. at 115, 365 P.2d at 708 (emphasis added).

The requirement of a demand on the record serves to put the parties and court on notice that, if they do not object, they will be deemed to have consented to the trial of the equitable issues to a jury. Susan cites *Jaynes v. Marrow*, 144 Colo. 138, 355 P.2d 529 (1960), for the proposition that a trial court may order a trial by jury without a timely jury demand being filed. However, *Jaynes* did not hold that a trial court could order a binding jury trial in a *non-jury* proceeding. *Jaynes* held that, in a proceeding in which a party may seek a trial by jury as of right, but fails to do so in a timely manner, the court may order a jury trial under C.R.C.P. 39(b). The present case falls under C.R.C.P. 39(c), and thus *Jaynes* is inapplicable.

Susan also cites *Shuman v. Tuxhorn*, 29 Colo.App. 152, 481 P.2d 741 (1971), in support of her argument that the parties and court consented to jury trial under C.R.C.P. 39(c). However, the plaintiffs in *Shuman* made "[a]n unqualified demand for a jury

trial ...," and defendants made no objection." 29 Colo.App. at 156, 481 P.2d at 742.

The question, therefore, is whether the parties, and court, consented to a jury trial in the probate case, No. 79PR0582, where Susan did make a demand for jury trial and paid the jury fee. I would conclude that, under *Young*, Susan has not demonstrated that the court consented to a binding jury trial in the probate case.

The pretrial order relied on by Susan as evincing consent, was actually entered in No. 79CV1840, and reflected that the probate case, No. 79PR0582, was to be consolidated for purposes of trial. There is no separate order for trial by jury in No. 79PR0582. Because the record in the probate case reflects no action taken one way or another with respect to Susan's jury demand, I would decline to find that Susan has shown that the "court and counsel [had] embark[ed] upon a non-jury statutory proceeding in such manner that it is [to be] treated as a jury case...." *Young*, 148 Colo. at 114–15, 365 P.2d at 708. The record does not show that the jury issue ever arose in the probate case until the morning of trial, at which time the court expressly reserved the issue of whether the jury would be advisory or not. Since Susan was aware, prior to the start of the trial, that the court was reserving the question of the binding effect of the jury's verdict, this case is distinguishable from *Young*. In *Young*, the trial judge first indicated that the jury might be advisory only at the close of the plaintiff's case in chief. *Id.* at 113, 365 P.2d at 707. That entire part of the proceedings, therefore, was tried with at least one of the parties believing that the jury was the actual trier of fact. In the present case, there was no element of reasonable reliance on the part of Susan that the jury verdict would be binding. Under these circumstances, Susan has not shown, under *Young*, that the court consented to try the probate case to a jury whose verdict would be binding. Since there was no consent, the court could properly treat the verdict of the jury as advisory only. In my view the trial court's decision to reserve the determination of the

effect of the jury's verdict until after trial was not a model procedure for other courts to follow, but I would not hold that it was reversible error to do so. I therefore concur with the majority's holding that the court of appeals erred when it held that the jury's verdict was binding under *Young*.

Accordingly, I specially concur.